UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



------------------------------------------------- x

In re Application of                        :

Kate O'Keeffe                               :

                                            :

To Issue a Subpoena for the Taking of a     :
Deposition and the Production of Documents for :
Use in a Foreign Proceeding                 :

                                            :

------------------------------------------------- x

Miscellaneous Case No.

### *EX PARTE* APPLICATION FOR AN ORDER UNDER 28 U.S.C. § 1782 TO ISSUE A SUBPOENA TO KWAME LUANGISA FOR THE TAKING OF A DEPOSITION AND THE PRODUCTION OF DOCUMENTS FOR USE IN A FOREIGN PROCEEDING

1.      Kate O'Keeffe (the "Applicant" or "O'Keeffe") applies to this Court for an Order, under 28 U.S.C. § 1782, and Rules 26, 30, 34, and 45 of the Federal Rules of Civil Procedure, granting Applicant leave to serve the subpoena attached as Exhibit 1 to the Declaration of Constance M. Pendleton (attached as Exhibit A to this Application), requiring Kwame Luangisa ("Luangisa") to produce documents and appear at a deposition.  Applicant is a Hong Kong-based reporter who is employed by Dow Jones & Company, Inc. to write material for its publications, including the *Wall Street Journal*, the *Wall Street Journal Asia*, and the *Wall Street Journal Europe*.  As explained below, Applicant, an interested party, seeks this evidence in aid of her defense against a libel claim filed by Sheldon G. Adelson currently pending against Applicant in Hong Kong, *Sheldon Gary Adelson and Kate O'Keeffe*, High Court of the Hong Kong Special Administrative Region (HCA 342/2013) (the "Hong Kong Lawsuit"), and asks this Court to grant such leave *ex parte*, or, in the alternative, that this Court enter an Order to Show Cause why the subpoena should not issue and order an accelerated briefing and hearing schedule.

2.      The libel claim against the Applicant arises out of an article written by O'Keeffe and Alexandra Berzon, and published in the December 7, 2012 edition of the *Wall Street Journal*.[1]  The article reports on a wrongful termination lawsuit filed by Steven Jacobs against his former employer, Las Vegas Sands Corp. ("LVSC"), and its Macau, China subsidiary, Sands China Ltd. ("SCL").  The article describes tensions that arose during Jacobs's employment between Jacobs and the Chairman of the Board and Chief Executive Officer of LVSC, Sheldon G. Adelson.

3.      Adelson is one of the wealthiest men in America and in the world, with a personal fortune of approximately $23.5 to $31.4 billion, according to sources such as Bloomberg and Forbes.  *See* Bloomberg Billionaires Index,  http://www.bloomberg.com/billionaires/2015-11-16/cya (last visited November 17, 2015) (No. 29); Forbes, "The World's Billionaires," http://www.forbes.com/billionaires/ (last visited November 17, 2015) (No. 18).  Adelson is also a frequent litigant who has brought numerous libel suits, including, most recently, a $60 million lawsuit against the National Jewish Democratic Council in the United States District Court for the Southern District of New York, dismissed with prejudice on September 30, 2013 (*Adelson v. Harris*, 973 F. Supp. 2d 467 (S.D.N.Y. 2013)), and a lawsuit against Jacobs in state court in Florida for a declaration filed in Jacobs's wrongful termination lawsuit (*Adelson v. Jacobs*, No. 12-28537 CA 24 (Fla. 11th Jud. Cir., filed July 20, 2012)) (the "Florida Lawsuit"), in which summary judgment was granted to Jacobs on February 24, 2014.  The Florida District Court of Appeal for the Third District affirmed the grant of summary judgment in July 2015.  *Adelson v. Jacobs*, 167 So.3d 517 (Mem) (Fla. 3d DCA 2015).  Adelson appealed the *Adelson v. Harris*

---

[1] A copy of the article is attached to the Declaration of Constance M. Pendleton (hereinafter "Pendleton Decl.") as Exhibit 2.

decision, and the U.S. Court of Appeals for the Second Circuit certified questions to the Nevada Supreme Court. *Adelson v. Harris*, 774 F.3d 803 (2d Cir. Dec. 19, 2014).

4.      The *Wall Street Journal* article contained the following sentence: "In some ways, Mr. Jacobs, a 6-foot-5-inch tall Ivy League graduate who colleagues say rarely curses, couldn't be more different from Mr. Adelson – a scrappy, foul-mouthed billionaire from working-class Dorchester, Mass."

5.      On February 22, 2013, Adelson filed the Hong Kong Lawsuit, a libel claim against O'Keeffe based upon the description of him in the December 7, 2012 article in the *Wall Street Journal* as "foul-mouthed."[2]  Adelson alleges that the description of him as "foul-mouthed" is defamatory and untrue.  Adelson claims in his Statement of Claim (March 1, 2013) that he is an "internationally renowned businessman, entrepreneur, and philanthropist" and the founder and chairman of LVSC and SCL, which are the largest and second-largest gaming companies by market capitalization in the world; that he and LVSC are well known worldwide; that the description of him as foul-mouthed "has caused him considerable distress and embarrassment"; that in the Article he was "specifically and directly referred to in his office as Chairman" of SCL and LVSC; that "foul-mouthed" in the Article was meant and understood to mean that he used bad language "in his office as Chairman" of SCL and LVSC and "in business meetings when addressing colleagues and subordinates"; that "the allegation was made of [Adelson] not just personally but more damagingly of him in his office as Chairman of SCL and [LVSC]"; and that the description of him as foul-mouthed "necessarily impact[s] upon both the

---

[2] Adelson filed an Amended Statement of Claim on June 1, 2015.  *Sheldon Gary Adelson and Kate O'Keeffe*, Amended Statement of Claim (hereinafter "Amended Statement of Claim") is attached to the Pendleton Decl. as Exhibit 3.

reputation and standing of SCL and [LVSC] and their market capitalizations." Amended Statement of Claim ¶¶ 1, 2, 5, 6, 13, 15-18.

6.      In his Amended Statement of Claim, Adelson defined "foul-mouthed" as meaning that he used language that was "obscene, profane, or scurrilous"; "abusive, coarse and offensive"; and/or "rude and lewd." *Id.* ¶ 15.[3]

7.      In her Amended Defence,[4] O'Keeffe defined "foul-mouthed" as meaning and intending to mean "only that [Adelson] had a tendency to use offensive, bad and/or coarse language." Amended Defence ¶ 13.

8.      As used throughout and solely for purposes of this Application and Subpoena, the phrase "foul or otherwise offensive language" shall mean:  foul, obscene, profane, scurrilous, abusive, blasphemous, coarse, offensive, rude, lewd, or bad language.

9.      The subpoena sought by O'Keeffe is reasonably calculated to lead to the discovery of evidence relevant to and for use in the defense of the libel claim against O'Keeffe. As outlined in O'Keeffe's Amended Defence, Applicant contends that the term "foul-mouthed" is "true in substance and fact," and gives several examples of Adelson's use of foul or otherwise "offensive language," based in part on published reports and public records, including:

- In 1999, the Plaintiff was verbally abusive to Temple Beth Sholom synagogue Rabbi Felipe Goodman in the latter's office in Las Vegas, following the synagogue's decision to hold a fundraiser at The Four Seasons rather than at the Plaintiff's own resort, The Venetian.

---

[3] Adelson has amended his Statement of Claim to delete "blasphemous," likely in response to O'Keeffe's Amended Defence, which cited a BBC program that aired on the TLC Network in which Adelson used the expression "God-damn."

[4] The Amended Defence was the subject of an application to amend, brought by summons dated August 14, 2013, and decided by the Hong Kong court on August 12, 2014.  A copy of the Amended Defence, as filed on September 3, 2014 pursuant to the Hong Kong Court's ruling, is attached to the Pendleton Decl. as Exhibit 4.  Adelson filed his Reply pleading in the Hong Kong Lawsuit on November 27, 2014, which is attached to the Pendleton Decl. as Exhibit 5.

- During a telephone call in December 2001, the Plaintiff swore at Richard Suen, a Hong Kong business man, referring to Mr. Suen in the following manner (or words to very similar effect): "*I never met someone who was so fucking bitter. You don't know shit about the financing of the business. I need this fucking Taiwanese because I need the money.*" [Emphasis added]

- In or around spring 2002, during dinner at the Chinese restaurant at The Regent Hong Kong - then a hotel in Kowloon - in the context of discussing litigation proceedings against him or LVS in Las Vegas, the Plaintiff said the following (or words very similar): "*Can you change the fucking judge?  He's nothing but a fucking pain in the ass.*" [Emphasis added]

- During the filming of the documentary "King of the Strip" produced by the British Broadcasting Corporation and The Learning Channel, and featuring the construction and subsequent opening in May 1999 of The Venetian (Las Vegas), the Plaintiff, knowing that he was being filmed and that his behaviour and what he said could be broadcast on television, said the following to a contractor in the context of discussing the colour of the windows:  "*I'm going to get God damn upset at you*".  The word "God" was bleeped out.

- During a US court deposition taken by law firm Campbell & Williams in 2006, the Plaintiff was discourteous, rude and arrogant.

- During a deposition given by the Plaintiff in the Florida Lawsuit on 23 October 2012, the Plaintiff, while listing things he said could potentially hurt his reputation, said the following: "*Murder, rape, dismembering, punching wise-ass attorneys in the face, all of that might hurt my reputation. Might.*" [Emphasis added]

- During a meeting with Mr. Jacobs (which took place prior to Mr. Jacobs' termination in July 2010), Mr. Jacobs reported to the Plaintiff the outcome of a meeting that Mr. Jacobs had had with Macau's then-Chief Executive, Edmund Ho, and told the Plaintiff that the then-Chief Executive would not take any actions to enable the proceeds of a sale of SCL's "Four Seasons" apartments to be included in SCL's valuation for the purpose of SCL's public listing. The Plaintiff replied saying that Chief

> Executive Ho had "*promised*" him Strata-Title [required to
> attribute the sale proceeds to SCL's valuation] and that
> Chief Executive Ho was reneging on his "*promise*". The
> Plaintiff then asked Mr. Jacobs to convey a message to
> Chief Executive Ho, referring to him as a "*son of a bitch*,"
> that the Plaintiff had settled a lawsuit paying $40 million
> dollars to keep Chief Executive Ho out of jail and that
> Chief Executive Ho owed Adelson Strata-Title as a result.

Amended Defence, Pendleton Decl., Ex. 4 at 4-6.  Evidence establishing the truth of O'Keeffe's

description of Adelson as "foul-mouthed" is a central issue in dispute in this case.[5]

---

[5] On September 18, 2014, Applicant filed similar *ex parte* applications pursuant to 28 U.S.C.
§ 1782, with the U.S. District Court for the District of Nevada seeking orders to issue subpoenas
to LVSC, Daniel J. Briggs (Vice President for Investor Relations at LVSC), Ron Reese (Vice
President for Public Relations at LVSC) (together with LVSC and Briggs, the "LVSC Parties"),
Brian Clark (a trial technician who worked on trials involving Adelson), and Rabbi Felipe
Goodman (to whom Adelson was allegedly verbally abusive).  On October 21, 2014, a
magistrate judge granted the applications.  On March 24, 2015, the magistrate judge in Nevada
denied the LVSC Parties' and Rabbi Goodman's motion to quash.  *See* Order, attached as
Exhibit 6 to the Pendleton Decl.  Rabbi Goodman's deposition was conducted on May 8, 2015.
The LVSC parties filed objections with the district court on April 7, 2015.  Applicant filed her
response on April 24, 2015, and the LVSC Parties filed their reply on May 4, 2015.  The district
court has not yet ruled on the objections.  Brian Clark's deposition was conducted on October 21,
2015.

Similarly, Applicant filed an *ex parte* application in the U.S. District Court for the District of
New Jersey seeking discovery from Kirk A. Thorell, a partner with PricewaterhouseCoopers,
LVSC's former auditor, pursuant to 28 U.S.C. § 1782.  The application was granted and LVSC
and Adelson moved to quash.  The magistrate judge denied the motion on February 10, 2015.
*See* Order and Opinion, attached as Exhibit 7 to the Pendleton Decl.  Adelson and LVSC filed
objections with the district court judge on February 20, 2015, which were fully briefed by the
parties.  On August 26, 2015, Judge William J. Martini of the U.S. District Court for the District
of New Jersey affirmed the magistrate judge's decision.  *See* Order and Opinion, attached as
Exhibit 8 to the Pendleton Decl.  LVSC and Adelson have appealed the decision to the Third
Circuit.  The appeal is fully briefed.

Applicant filed an *ex parte* application in the U.S. District Court for the District of Florida
seeking discovery from Nikita Zukov, an architect who interacted professionally with Adelson,
pursuant to 28 U.S.C. § 1782.  The application was granted and Adelson moved to quash.  The
magistrate judge found that all four of the *Intel* factors favored O'Keeffe, but nonetheless
granted Adelson's motion to quash on the basis that the 26-year old evidence was not relevant.
*See* Order and Opinion, attached as Exhibit 9 to the Pendleton Decl.  O'Keeffe filed objections

10.     Kwame Luangisa is a former personal driver and security staff member for Adelson in Las Vegas, upon information and belief, now living in Mount Vernon, New York.  In his position as personal driver and security staff member, Luangisa regularly interacted with Adelson on a professional basis.

11.     In or around March 2011, as referred to in the Amended Defence (Ex. 4 at 5), Adelson launched an "abusive tirade" against Luangisa, which (inter alia) caused Luangisa to resign on March 25, 2011, according to a complaint Luangisa filed in the U.S. District Court for the District of Nevada in 2011 against Adelson and one of his companies for alleged violations of overtime laws.

12.     Applicant seeks the testimony and documents described in the attached Subpoena and Schedules A and B to the Subpoena and Attachment A annex thereto (which are incorporated by reference in this motion), including, but not limited to, information regarding Luangisa's interactions with and observations of Adelson, including in the context of his work as a personal driver and security staff member for Adelson, and the reasons for his resignation.

13.     Luangisa's testimony and documents regarding his interactions with Adelson will shed light on Adelson's tendency to use foul or otherwise offensive language.

14.     Applicant has not been able to obtain the requested discovery.   The Applicant is left with little choice but to seek judicial assistance of this Court under 28 U.S.C. § 1782 to compel Luangisa's testimony and production of documents.

15.     This application meets the statutory requirements of § 1782, which provides as follows:

        (a)  The district court of the district in which a person resides or is

on September 17, 2015; Adelson filed a response on October 7, 2015; and O'Keeffe filed a reply on October 19, 2015.  The district court has not yet ruled on the objections.

> found may order him to give his testimony or statement or to produce
> a document or other thing for use in a proceeding in a foreign or
> international tribunal, including criminal investigations conducted
> before formal accusation.  The order may be made . . . upon the
> application of any interested person and may direct that the
> testimony or statement be given, or the document or other
> thing be produced, before a person appointed by the court.

28 U.S.C. § 1782 (2006).  As stated by the Supreme Court in *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 246-47 (2004), to obtain discovery, the applicant must make a threshold showing that:

> (1) the person from whom the discovery is sought either
> "resides" or is "found" in this District;
>
> (2) the discovery is "for use in a proceeding" before a "foreign
> tribunal"; and
>
> (3) the applicant qualifies as an "interested person."

*Id.*  The application filed by O'Keeffe meets all of the requirements of 28 U.S.C. § 1782.

16.    Upon information and belief, Luangisa resides in Mount Vernon, New York.  He is, therefore, "found" in this judicial district for purposes of § 1782 by force of his residence here.

17.    The discovery sought is for use in the defense of the libel claim brought by Adelson, a civil proceeding currently pending in Hong Kong against the Applicant.  The Hong Kong court entertaining the civil proceeding clearly qualifies as a foreign tribunal.  Section 1782 previously has been applied to authorize discovery for matters pending in the Hong Kong courts, including for this Hong Kong Lawsuit as noted *supra*.  *See In re Application of Esses*, 101 F.3d 873 (2d Cir. 1996); *In re Mak*, 2012 WL 2906761 (N.D. Cal. July 16, 2012); *Abbott Labs. v. Rankin*, Order, ECF No. 4, No. 3:12-cv-00360 (W.D. Wis. May 24, 2012).

18.   As the defendant in the foreign civil proceeding, the Applicant qualifies as an "interested person" within the meaning of § 1782. "An interested person includes a party to the foreign litigation, whether directly or indirectly involved." *In re Merck & Co.*, 197 F.R.D. 267 (M.D.N.C. 2000) (citing *Lancaster Factoring Co. v. Mangone*, 90 F.3d 38 (2d Cir. 1996)).

19.   Once the statutory requirements of § 1782 are met, "a district court is free to grant discovery in its discretion." *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 80 (2d Cir. 2012) (internal quotation marks omitted).

20.   In *Intel Corp.*, the Supreme Court set forth the factors that may inform the district court's discretion in deciding to grant a § 1782 application. A court need not consider all of these factors in making its decision on the application, but may use them as guides in its decision-making. The discretionary factors that may be considered are as follows:

(1) whether the persons from whom the discovery is being sought are participants in the foreign proceeding;

(2) the nature and character of the foreign proceeding and the receptivity of the foreign tribunal to U.S. federal judicial assistance;

(3) whether the request is an attempt to circumvent foreign proof-gathering limitations; and

(4) whether the discovery sought is unduly burdensome.

542 U.S. at 264-65.

21.   Each of the *Intel Corp.* discretionary factors favors granting Applicant's request for judicial assistance:

- Luangisa is not a party to the civil proceedings in Hong Kong, and his evidence is, therefore, unavailable in that proceeding without this Court's assistance. *Intel Corp.*, 542 U.S. at 264 ("[N]onparticipants in the foreign proceeding may be

outside the foreign tribunal's jurisdictional reach; hence, their evidence, available

in the United States, may be unobtainable absent § 1782(a) aid.").

- The nature and character of the proceedings in Hong Kong warrant the Court's

    assistance, *Intel Corp.*, 542 U.S. at 264.  The libel claim is brought in Hong Kong

    by Sheldon Adelson, a U.S. citizen, against Kate O'Keeffe, a U.S. citizen,

    regarding an article she authored in the *Wall Street Journal* reporting on a matter

    of significant public import:  the business dealings of one of the world's most

    wealthy and prominent business executives, with major gaming businesses in both

    Las Vegas, Nevada, and Macau, China.  Section 1782 contains no "foreign-

    discoverability" prerequisite.  *Intel Corp.*, 542 U.S. at 259-64; *Mees v. Buiter*, 793

    F.3d 291, 303 (2d Cir. 2015).  Rather, the court "should consider only

    authoritative proof that a foreign tribunal would reject evidence obtained with the

    aid of Section 1782. . . . Absent this type of clear directive, however, a district

    court's ruling should be informed by section 1782's overarching interest in

    'providing equitable and efficacious procedures for the benefit of tribunals and

    litigants[.]'" *Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1100 (2d Cir.

    1995) (citation omitted).  No such authoritative proof exists here, as the Florida

    and Nevada magistrate judges and the New Jersey district court have found.  *In re*

    *Application of Kate O'Keeffe*, No. 15-mc-80651-MARRA-MATTHEWMAN,

    ECF No. 18, at 8 (S.D. Fla. Aug. 27, 2015) ("[T]he second *Intel* factor weighs in

    favor of granting O'Keeffe's Application as there is no evidence before the Court

    that Hong Kong would be unreceptive to the testimony sought by O'Keeffe."),

    attached to the Pendleton Decl. as Ex. 9; *In re Application of Kate O'Keeffe*, No.

2:14-cv-01518, ECF No. 43 at 6-8 (D. Nev. Mar. 24, 2015) ("[N]either [the

experts'] affidavits, nor movants and O'Keeffe's assertions and supplements,

constitute 'authoritative proof' that the requested discovery would be unwelcome

to the Hong Kong Court."), attached to the Pendleton Decl. as Ex. 6; *O'Keeffe v.*

*Thorell*, No. 2:14-cv-05835, ECF No. 38, at 3 (D.N.J. Aug. 26, 2015) ("Here, the

record contains no authoritative proof that the Hong Kong court would be

unreceptive to the District of New Jersey's assistance."), attached to the Pendleton

Decl. as Ex. 8.

- The application is not a bad faith attempt to circumvent proof-gathering

  restrictions in the foreign proceedings, but rather is a good faith effort to secure

  relevant evidence from a U.S. witness who is beyond the jurisdiction of the

  foreign court. *See In re Application of Hornbeam Corp.*, No. 14 Misc. 424, 2014

  WL 8775453, at *4 (S.D.N.Y. Dec. 24, 2014). Both the Florida and Nevada

  magistrate judges and the New Jersey district court have found that O'Keeffe's

  applications pursuant to § 1782 did not constitute circumvention of proof-

  gathering restrictions in the Hong Kong court. *In re Application of Kate*

  *O'Keeffe*, No. 15-mc-80651-MARRA-MATTHEWMAN, at 9 ("O'Keeffe, a

  United States citizen, is relying upon a discovery procedure that is available to her

  under United States law and should not be penalized for that . . . ."), attached to

  the Pendleton Decl. as Ex. 9; *In re Application of Kate O'Keeffe*, No. 2:14-cv-

  01518, ECF No. 43 at 6, 8 ("O'Keeffe was not required to request discovery

  through the Hong Kong Court."), attached to the Pendleton Decl. as Ex. 6;

  *O'Keeffe v. Thorell*, No. 2:14-cv-05835, ECF No. 38, at 4 ("[T]he record lacks

any indication that O'Keeffe is attempting to evade restrictions on discovery in Hong Kong."), attached to the Pendleton Decl. as Ex. 8. Plainly, discovery pursuant to § 1782 is a more direct, efficient, and cost-effective use of litigant and court resources than the two-step process required by letters rogatory – application first to the Hong Kong court and then to the U.S. court. Rational actors do not needlessly increase their own ligation costs.

- The discovery requests are not unduly intrusive or burdensome, since the subjects of inquiry are limited to Adelson's use of foul or otherwise offensive language, Luangisa's encounters with and observations of Adelson, and the reasons for Luangisa's resignation.

22.     Accordingly, O'Keeffe respectfully requests that her Application under 28 U.S.C. § 1782 be granted and that Applicant be authorized to serve the subpoena attached as Exhibit 1 to the Declaration of Constance M. Pendleton, which is attached to this Application.

Respectfully submitted,

DAVIS WRIGHT TREMAINE LLP

Laura R. Handman
Constance M. Pendleton

1521 Avenue of the Americas, 21st Floor
New York, New York  10020-1104
Telephone:  (212) 489-8230
Facsimile:  (212) 489-8340

1919 Pennsylvania Avenue, N.W., 8th Floor
Washington, D.C.  20006
Telephone: (202) 973-4224
Facsimile:  (202) 973-4499
Email: laurahandman@dwt.com
Email: conniependleton@dwt.com

*Attorneys for Applicant*
*Kate O'Keeffe*

Dated:  January 11, 2016

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------ x

In re Application of

Kate O'Keeffe

To Issue a Subpoena for the Taking of a
Deposition and the Production of Documents for
Use in a Foreign Proceeding

: Miscellaneous Case No.
:
:
:
:
:
:
:
:
:

------------------------------------------------------ x

## DECLARATION OF CONSTANCE M. PENDLETON

Constance M. Pendleton hereby declares and states as follows:

1.      I am a member of the law firm of Davis Wright Tremaine LLP, which represents

Kate O'Keeffe in this action.  I am admitted to practice before the courts of New York State and

Washington, D.C., and the U.S. District Court for the Southern District of New York.  I make

this declaration in support of the Application for an Order Under 28 U.S.C. § 1782 to Issue a

Subpoena to Kwame Luangisa ("Luangisa") for the Taking of a Deposition and the Production of

Documents for Use in a Foreign Proceeding (the "Application") upon my personal knowledge.

2.      Attached hereto as Exhibit 1 is the subpoena to Kwame Luangisa with schedules

and attachments.

3.      Attached hereto as Exhibit 2 is a true and correct copy of an article titled "Fired

Executive Rankles Casino Business – Former Sands China Chief's Wrongful Termination Suit

Puts Spotlight on U.S. Gambling Operators in China's Gambling Enclave," written by Kate

O'Keeffe and Alexandra Berzon, and published by Dow Jones & Company, Inc. in the

December 7, 2012 edition of the *Wall Street Journal*.

4.       Attached hereto as Exhibit 3 is a true and correct copy of an Amended Statement of Claim dated June 1, 2015 and filed by Adelson in the High Court of the Hong Kong Special Administrative Region in the case *Sheldon Gary Adelson and Kate O'Keeffe*, amending the Statement of Claim dated March 1, 2013.

5.       Attached hereto as Exhibit 4 is a true and correct copy of the Amended Defence filed by O'Keeffe in the High Court of the Hong Kong Special Administrative Region in the case *Sheldon Gary Adelson and Kate O'Keeffe* on September 3, 2014.[6]

6.       Attached hereto as Exhibit 5 is a true and correct copy of the Reply filed by Adelson in the High Court of Hong Kong Special Administrative Region in the case *Sheldon Gary Adelson and Kate O'Keeffe* on November 27, 2014.

7.       Attached hereto as Exhibit 6 is a true and correct copy of the March 24, 2015 Order of U.S. Magistrate Judge C. W. Hoffman, Jr. of the U.S. District Court for the District of Nevada denying Las Vegas Sands Corp. (LVSC), Daniel J. Briggs, Ron Reese, and Rabbi Felipe Goodman's motion to quash Applicant's subpoenas.

8.       Attached hereto as Exhibit 7 is a true and correct copy of the February 10, 2015 Order and Opinion of U.S. Magistrate Judge Mark J. Falk of the U.S. District Court for the District of New Jersey denying Adelson and LVSC's motion to quash Applicant's subpoena on Kirk A. Thorell, a partner at PricewaterhouseCoopers, Adelson's former auditor.

9.       Attached hereto as Exhibit 8 is a true and correct copy of the August 26, 2015 Order and Opinion of U.S. District Court Judge William J. Martini of the U.S. District Court for the District of New Jersey affirming the magistrate judge's denial of Adelson and LVSC's motion to quash Applicant's subpoena on Thorell.

---

[6] The Amended Statement of Claim and the Amended Defence as filed show all amendments in redline in accordance with the Hong Kong court's procedural rules.

10.     Attached hereto as Exhibit 9 is a true and correct copy of the August 27, 2015 Order of U.S. Magistrate Judge William Matthewman of the U.S. District Court for the Southern District of Florida granting Adelson's Motion to Quash Applicant's Subpoena to Nikita Zukov.

I declare on this the 11th day of January, 2016, under penalty of perjury under the laws of the United States and State of New York, that the foregoing is true and correct.

*Constance M Pendleton*

Constance M. Pendleton

# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------- x

In re Application of                                :
Kate O'Keeffe                                       :        Miscellaneous Case No.
                                                    :
To Issue a Subpoena for the Taking of a             :
Deposition and the Production of Documents for      :
Use in a Foreign Proceeding                         :
                                                    :
-------------------------------------------------- x

**SUBPOENA TO TESTIFY AT A VIDEOTAPED DEPOSITION AND
TO PRODUCE DOCUMENTS IN A CIVIL ACTION**

To:     Kwame Luangisa
        374 Hawthorne Terrace
        Mount Vernon, NY 10552-2426

YOU ARE COMMANDED to appear at the offices of Davis Wright Tremaine LLP at

1251 Avenue of the Americas, 21st Floor, New York, New York 10020-1104, on February 29,

2016, at 10:00 a.m. to testify at a videotaped deposition to be taken in a civil action.  The

deposition will be recorded by videotape and stenography by a fully authorized court reporter.

You, or your representatives, must also bring with you to the deposition copies of any

and all documents, including videotapes and DVDs in your possession, custody and control as

set forth in Schedule B annexed hereto.

The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to

a subpoena, and Rule 45(d) and (e), relating to your duty to respond to this subpoena and the

potential consequences of not doing so, are attached.

Respectfully submitted,

Dated:  New York, NY

DAVIS WRIGHT TREMAINE LLP

January 11, 2016

By: _Constance M Pendleton_

Laura R. Handman
Constance M. Pendleton

1521 Avenue of the Americas, 21st Floor
New York, New York  10020-1104
Telephone:  (212) 489-8230
Facsimile:  (212) 489-8340

1919 Pennsylvania Avenue, NW, 8th Floor
Washington, D.C.  20006
Telephone:  (202) 973-4224
Facsimile:  (202) 973-4499
Email: laurahandman@dwt.com
Email: conniependleton@dwt.com

*Attorneys for Applicant
Kate O'Keeffe*

## SCHEDULE A

## DEFINITIONS

1.      "Adelson" shall mean the individual Sheldon G. Adelson.

2.      The terms "all," "any," and "each" shall each be construed as encompassing any and all.

3.      The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

4.      The phrase "foul or otherwise offensive language" shall mean: foul, obscene, profane, scurrilous, abusive, blasphemous, coarse, offensive, rude, lewd, or bad language.

5.      The use of the singular form of any word includes the plural and vice versa.

## MATTERS FOR EXAMINATION

1.      Any instances in which Adelson used foul or otherwise offensive language.

2.      Any communication between you and Adelson in which Adelson used foul or otherwise offensive language.

3.      Any communication between you and others in which Adelson's use of foul or otherwise offensive language was referenced or discussed.

4.      Adelson's demeanor.

5.      Your encounters with and observations of Adelson, including any tirade by Adelson against you and/or his former security staff in or about March 2011.

6.      Your resignation from Adelson's and/or LVSC's service.

1

## SCHEDULE B

## DEFINITIONS

1.      "Adelson" shall mean the individual Sheldon G. Adelson.

2.      The term "document" is defined to be synonymous in meaning and equal in scope to the usage of the term "documents or electronically stored information" in Fed. R. Civ. P. 34(a)(1)(A).  A draft or non-identical copy is a separate document within the meaning of this term.

3.      The terms "all," "any," and "each" shall each be construed as encompassing any and all.

4.      The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

5.      The phrase "foul or otherwise offensive language" shall mean: foul, obscene, profane, scurrilous, abusive, blasphemous, coarse, offensive, rude, lewd, or bad language.

6.      The use of the singular form of any word includes the plural and vice versa.


## INSTRUCTIONS

1.      Each request for documents is to be fully and separately answered.

2.      These requests cover all documents in your possession, custody, or control, regardless of where such documents are located.

3.      Each requested document is to be produced (along with all drafts thereof) in its entirety, without abbreviation or redaction.  In the event that a copy of a requested document is not identical to any other copy thereof, because of any alterations, marginal notes, comments, or material contained therein or attached thereto, or otherwise, all such non-identical copies shall be

2

produced separately.

4.      Any legitimate concerns regarding production of confidential or privileged information may be addressed through appropriate redaction of such material other than evidence related to Adelson's use of foul or otherwise offensive language.  With respect to any document responsive to any request that is withheld from production or redacted based upon a claim of privilege, please provide a privilege log with the information required pursuant to Rule 45(d)(2) of the Federal Rules of Civil Procedure.  Identify and produce each segregable portion of any document withheld in part based upon a claim of privilege as to which the basis for withholding other portions of the document does not apply.

5.      All requested documents are to be produced as they are kept in the usual course of business so that the files in which they were located, their relative order in such files, and how such files were maintained can be ascertained.

6.      If any document responsive to any of these requests has been destroyed, discarded or lost, please separately identify each such document by stating the following information with respect thereto: (a) the title and a description of the subject matter of the document; (b) the date or approximate date of the preparation and/or transmission of the document; (c) the number of pages, attachments or appendices of the document; (d) the identity of the person who destroyed, discarded or lost the document; (e) the date or approximate date the document was destroyed, discarded or lost; (f) a description of the circumstances under which the document was destroyed, discarded or lost; (g) the identity, if known, of each person who originated, circulated, published or received the document; and (h) the identity of the person having custody of the document immediately prior to its destruction, discarding or loss.

7.      Unless otherwise indicated, no request shall be construed to limit the scope of any other request.

8.      All electronically stored information should be produced as Bates-stamped TIFF images with accompanying document-level extracted text for ESI or OCR for scanned hard copy, and a loadfile listing selected metadata to be decided upon by the parties by mutual agreement. Please produce all Excel files in native format.

## DOCUMENTS REQUESTED

1.      All documents, including email or electronic communications, relating to any communication between you and Adelson in which Adelson used foul or otherwise offensive language, including, but not limited to, documents containing one or more of the search terms set forth in Attachment A hereto.

2.      All documents, including email or electronic communications, referencing, describing, or reflecting Adelson's use of foul or otherwise offensive language, including, but not limited to, documents containing one or more of the search terms set forth in Attachment A hereto.

3.      All documents, including email or electronic communications, referencing, describing, or reflecting your encounters with and observations of Adelson, including any tirade by Adelson against you and/or his former security staff in or about March 2011.

4.      All documents, including email or electronic communications, referencing, describing, or reflecting the reasons for your resignation from Adelson's and/or LVSC's service.

## ATTACHMENT A – Search Terms

"ass," "bastard," "bitch," "chink," "cock," "coon," "cunt," "crap," "dago," "damn," "dick," "douche," "dyke," "fag,"   "flamer," "fuck," "Goddamn," "gook," "goy," "guido," "hebe, "hell," "homo," "jackass," "jap," "Jesus Christ," "kike," "mick," "nigger," "pecker," "piss," "pollack," "prick," "pussy," "putz," "queer," "schmuck," "schvartze," "screw," "shiksa," "shit," "shyster," "skank," "slant," "slut," "spic," "suck," "tit," "towel head," "twat," "wetback," "whore," "wog," or "wop";

any derivative or compound words containing any of the aforementioned words, and any bowdlerized form thereof.

# EXHIBIT  2



News, Quotes, Companies, Videos   SEARCH

$1 A WEEK *for* 12 WEEKS   SUBSCRIBE NOW

Subscribe   Log In

U.S. EDITION   Wednesday, December 5, 2012 As of 7:08 PM EST

Home | World | U.S. | Business | Tech | Markets | Market Data | Your Money | Opinion | Life & Culture | N.Y. | Real Estate | Management

Earnings | Economy | Health | Law | Autos | Management | Media & Marketing | Energy | Small Business | Startups | More Industries ▼

TOP STORIES IN BUSINESS

1 of 12 — **Noose Tightens on Brazil's OGX**
2 of 12 — **Marc Jacobs May Leave Vuitton**
3 of 12 — **GM Succession Sets Up Game of Thrones**
— **Merck to Cut St by 20%**

LAW | December 5, 2012, 7:08 p.m. ET

# Fired Executive Rankles Casino Business

*Former Sands China Chief's Wrongful Termination Suit Puts Spotlight on U.S. Operators in China's Gambling Enclave*

Article | Stock Quotes | Comments (6)      MORE IN LAW »

Email | Print

By KATE O'KEEFFE and ALEXANDRA BERZON



Agence France-Presse/Getty Images
Las Vegas Sands Chairman Sheldon Adelson, left, pictured in 2010 with Steve Jacobs, whose suit is roiling the lucrative Macau casino business.

In just a year on the job, Steve Jacobs's uncompromising manner helped turn around Las Vegas Sands Corp.'s [LVS -0.52%] Macau gambling operations. In the two years since he was fired, its impact has become far greater.

Allegations in a wrongful termination lawsuit filed in Nevada in October 2010 by Mr. Jacobs have spawned U.S. bribery investigations and Macau probes into Las Vegas Sands and cast an unwelcome spotlight on U.S. casino operators in the Chinese enclave.

Mr. Jacobs, 50 years old, is a hard charger who former co-workers say was prized for his smarts and chided for an abrasive bluntness. But he met his match in Sands Chairman Sheldon Adelson.

Their fight, playing out in U.S. courts, has regulators taking a closer look at industry practices in Macau, home to lucrative casinos built by Sands and rivals Wynn Resorts Ltd. [WYNN -0.11%] and MGM Resorts International [MGM -0.38%] . The dispute "has caused many a sleepless night for some casino executives," said Mike Rumbolz, a former chairman of industry regulator Nevada Gaming Control Board. Macau is critical because it produces more than five times the revenue of the Las Vegas Strip.

One of five children of a Maryville, Tenn., sales executive and a department-store


SYNC. TRACK. DECIDE.
SYNC YOUR BROKERAGE ACCOUNTS. GET ALL THE MOST IMPORTANT HEADLINES FOR YOUR HOLDINGS.
USE PORTFOLIO NOW »

**Don't Miss** [?]

WSJ/NBC Poll: GOP Suddenly Becoming Popular
Five Things Your Personal Trainer Won't Tell You
Will Floyd Mayweather's Wealth Last?

**More in Law**

Businesses Balk at Gay Weddings
Cuban Insider-Trading Trial Begins
Tourre Asks for New Trial

**Popular Now**   What's This?

 **To Fix Education, Look to the Past**



worker, Mr. Jacobs set up and ran a lawn-cutting business as a 14-year-old that employed several friends and later helped his father start a small business.

Mr. Jacobs's toughness grew out of early misfortunes. At Harvard College, where he studied biochemistry, he broke his neck playing on its football team and took a semester off during his sophomore year to help care for his mother, who became ill and died of cancer. After graduating, Mr. Jacobs earned a small fortune as a consultant.

He and Las Vegas Sands President Mike Leven met while working together at Holiday Inn. Even today Mr. Leven praises his former colleague's business skills. But Mr. Leven recalls advising his friend to "start your own business, because you don't have to worry about corporate politics." Mr. Leven later hired Mr. Jacobs's firm to assist Sands's turnaround, a job that led to Mr. Jacobs becoming chief executive of Sands China Ltd., the company's Macau operation. As CEO, he bristled at what he felt was interference from Las Vegas.

Tensions between Messrs. Jacobs and Adelson brewed over the course of the year. Executives say neither was the type to compromise when he felt strongly about something. Some casino executives say privately they wish Mr. Adelson would settle the case. "I want it to go away," said a senior official at a rival company in Macau. "It is a nightmare," the person said, referring to the case and scrutiny it has spawned.

In some ways, Mr. Jacobs, a 6-foot-5-inch-tall Ivy League graduate who colleagues say rarely curses, couldn't be more different from Mr. Adelson—a scrappy, foul-mouthed billionaire from working-class Dorchester, Mass. Disagreements with Mr. Adelson, 79, could turn into a "junkyard dogfight," former Sands President Bill Weidner said at a conference in 2008.

One thing Messrs. Jacobs and Adelson had in common, though, was abrasiveness, say colleagues. Bill Watson, a hotel executive who worked with Mr. Jacobs at Best Western, said he respected the young executive, but keeping his ego under control was a problem. At board meetings, Mr. Jacobs often cut off executives, he said. At one of his first staff meetings in Macau, Mr. Jacobs introduced himself to around 80 employees by saying: "A lot of people want to know about me. By the time I was 30, I had laid off tens of thousands of people," said several executives who attended the meeting.



2   **J.P. Morgan Insider Aids Probe**



**Capital Digs In for Long Haul**



**Opinion: Fred Barnes: The President's Shutdown**



**Asking the Doctor, 'Have You Washed Your Hands?'**



Show 5 More

---

**Rocky Relationship**

**Key events in the dispute**

March 2009: Sands shares hit all-time low the same month it hires Mr. Jacobs.

May 2009: Mr. Jacobs named head of Sands's Macau operation, Sands China.

November 2009: Sands China has $2.5 billion IPO.

July 2010: Sands fires Mr. Jacobs, who later sues.

March 2011: Sands discloses U.S. probes stemming from suit.

Source: WSJ staff reports

As Sands China's chief executive, Mr. Jacobs cumulatively cut more than $365 million in costs from the Macau operation, according to his lawsuit. He also presided over record earnings and an initial public offering of the business. Sands China's net profit more than tripled to $666.5 million the year he left.

As Mr. Jacobs sought more autonomy for the Macau business, he clashed with Mr. Adelson. "He'd argue point by point with Adelson, reminding him that he just got one vote as the chairman. This is the kind of stuff that drove Adelson mad," said a senior Sands executive.

Among those disputes: they argued over who would oversee a new casino in Macau. Mr. Jacobs insisted it should be run by local executives and Mr. Adelson wanted it to be overseen from Las Vegas, say Sands executives. In June 2010, Mr. Adelson said in an interview that Mr. Jacobs had overstepped his role by publicly commenting on the potential for gambling in Japan. Soon thereafter, Mr. Jacobs was fired.

**Content from our Sponsors**  [?]



EXXONMOBIL PERSPECTIVES BLOG
**Why Californians Paid 80 Cents More Per Gallon of Gas**



OPEN FORUM
**Stupid Workplace Rules That Destroy Employee Morale**



INVESTOPEDIA
**Retirement Investing Mistake #7: Too Much in your IRA**

Mr. Adelson recently conceded he wishes he had settled the wrongful termination lawsuit early on but now doesn't want to give in to what he believes are improper accusations. "If we had known he was going to cause so much trouble, yeah, we would have given him what he wanted," Mr. Adelson said in an interview.

He called Mr. Jacobs a "disgruntled employee" and denied the accusations in the lawsuit. Mr. Adelson accused Mr. Jacobs of threatening the company when he was fired and of seeking to embarrass him personally. He said Sands would emerge unscathed from the probes, which have already cost the company almost $60 million in legal fees, far more than Mr. Jacobs's contract, valued at an estimated $10 million at his dismissal.

Mr. Jacobs's lawyer, James Pisanelli, dismisses the notion that personal animosity motivated the suit.

"This litigation was never designed to bring down the gaming industry, or even Las Vegas Sands or its executives for that matter. Mr. Jacobs's sole objective in filing his lawsuit is and always has been to recover what he is owed," he said.

Heightened scrutiny has become a big concern among casino operators in the aftermath of Mr. Jacobs's allegations, which include being ordered to hire a lawyer he believed could violate antibribery laws. "Anticorruption has moved from a more remote regulatory concern to something that is front and center for any gaming company with an international presence," said John McManus, general counsel for MGM Resorts. Tim Donovan, Caesars Entertainment Corp.'s ⬚ CZR +0.10% general counsel, said: "Our compliance committee meets twice as often now, and the Foreign Corrupt Practices Act is one of the focuses."

Meanwhile, the feud has grown increasingly bitter. In a June court filing, Mr. Jacobs said Mr. Adelson had approved a "prostitution strategy" at the company's Macau properties. Mr. Adelson responded with a defamation suit in Florida calling that allegation and others "shockingly outrageous and utterly false."

Today, Mr. Jacobs lives in Florida managing his investments and coaching a daughter's recreational league basketball team, which this year won the Youth Basketball of America's National Championship for division one 8th graders.

—Alicia Mundy contributed to this article.

**Write to** Kate O'Keeffe at kathryn.okeeffe@dowjones.com and Alexandra Berzon at alexandra.berzon@wsj.com

JOIN THE DISCUSSION
**6 Comments, add yours**

MORE IN
**Law »**

Email    Print    ⬚    Order Reprints

SYNC. TRACK. DECIDE.    THE MOST IMPORTANT HEADLINES FOR YOUR HOLDINGS
**USE PORTFOLIO NOW »**

## Don't Miss

 **Model Behavior Storms Social Media**

 **Grilling Up Feral Pig in Oregon**

 **Opinion: The "Defund ObamaCare" Caucus Retreats**

 **Five Countries With the Most Multimillionaires**

## You Might Like

Is being a 'Desi' good or bad? Answer: both.

Cyclist Arrested in SUV Chase Case

One More White-Collar Job Set to Be Killed by Computers

Burning question: Science can explain why humans burst into flame

Want a new bike? Now is the time to find deals.

## Content from our Sponsors

What's this?

Danica Patrick's Road to Health (Lifescript.com)

What Would You Do With Another 40 Years? (Bring Your Challenges)

5 Ways to Spot Skin Cancer (A Bullseye View)

Stepkids add to caregiver burden (Bankrate.com)

5 steps to fix long-term care (Bankrate.com)

## Add a Comment

JOURNAL COMMUNITY

View All Comments (6)

Community rules

To add a comment please

**Log in**     **Create an Account**

Your real name is required
for commenting.

☐  Track replies to my comment



## Editors' Picks



**Uruguay Challenges Latin American Taboos**



**Grand Tours With Grandparents**



**Help Wanted---on Writing Job Descriptions**



**New Spin on Video Chats**



**A Scientist Teaches Drones and Queens the Birds and Bees**

Subscribe / Login          Back to Top

**Customer Service**

Customer Center

New! Live Help

Contact Us

WSJ Weekend

Contact Directory

Corrections

**Policy**

Privacy Policy

Data Policy

Copyright Policy

Subscriber Agreement & Terms of Use

Your Ad Choices

**Advertise**

Advertise

Place a Classified Ad

Sell Your Home

Sell Your Business

Commercial Real Estate Ads

Recruitment & Career Ads

Franchising

Advertise Locally

**Tools & Features**

Apps

Newsletters and Alerts

Graphics & Photos

Columns

Topics

Guides

Portfolio

Old Portfolio

**More**

Register for Free

Reprints

Content Partnerships

Conferences

SafeHouse

Mobile Site

News Archive

**Jobs at WSJ**

Copyright ©2013 Dow Jones & Company, Inc. All Rights Reserved.

# EXHIBIT  3

Amended as in red this 1st day
of June, 2015 pursuant to the
Order of Master K. Lo dated the
29th day of May, 2015.

HCA 342/2013

**IN THE HIGH COURT OF THE**

**HONG KONG SPECIAL ADMINISTRATIVE REGION**

**COURT OF FIRST INSTANCE**

**ACTION NO. 342 OF 2013**

―――――――――――

BETWEEN

SHELDON GARY ADELSON                    Plaintiff

and

KATE O'KEEFFE                    Defendant

―――――――――――

**<u>AMENDED</u> <u>STATEMENT OF CLAIM</u>**

(Writ of Summons issued on the 22nd day of February, 2013)

**<u>The Parties</u>**

1.     The Plaintiff is an internationally renowned businessman, entrepreneur, and philanthropist.   He is the founder and Chairman of Sands China Ltd. ("SCL"), a substantial public company listed on the Hong Kong Stock Exchange and a constituent stock in the Hang Seng Index.   He is also the founder and Chairman of Las Vegas Sands Corp. ("LVS"), a substantial public company listed on the New York Stock Exchange.

2.     LVS is the largest gaming company by market capitalization and SCL is the second largest gaming company by market capitalization in the world.

3.     Depending on stock price fluctuation, LVS is between the 50th and 75th largest company by market capitalization in the U.S. of any industry.

4.     LVS is in the middle group of the Fortune 500 worldwide.

– 2 –

5.      LVS is well known worldwide as is its Chairman, the Plaintiff.

6.      The Plaintiff is also a notable philanthropist who has consistently over many years donated substantial amounts to a variety of civic and charitable causes worldwide.

7.      The Defendant is a journalist.  The Plaintiff has no knowledge of her employment status.  Frequently she writes material, but not exclusively, for publications of the Dow Jones Group including The Wall Street Journal, The Wall Street Journal Asia and The Wall Street Journal Europe.

**The Article**

8.      In the U.S. edition of The Wall Street Journal published on 6th December, 2012 on page B10 an article was published under the headline "Fired Executive Rankles Casino Industry".

9.      On 7th-9th December, 2012 on page 17 of The Wall Street Journal Asia a similar article under the headline "Fired Executive Upsets Casino Business" was published.

10.     On 7th-9th December, 2012 on page 22 of The Wall Street Journal Europe a similar article under the headline "Fired Executive Upsets Casino Business" was published.

11.     Although there were minor differences between the content of the three articles, all three articles contained the following paragraph :-

"In some ways, Mr. Jacobs, a 6-foot-5-inch-tall Ivy League graduate who colleagues say rarely curses, couldn't be more different from Mr. Adelson—a scrappy, foul-mouthed billionaire from working-class Dorchester, Mass. ......"

– 3 –

The Wall Street Journal Europe omitted the words "a 6-foot-5-inch-tall" when it published the article.

12.     The three articles stated that they were written by the Defendant and two others (collectively the three articles are referred to as "the Article").

**Reference to the Plaintiff**

13.     The Article and in particular the allegation of "foul-mouthed" set out in paragraph 11 above unequivocally referred to the Plaintiff.

<strong>Particulars</strong>

(1)     The Plaintiff was specifically and directly referred to by his name.

(2)     The Plaintiff was specifically and directly referred to in his office as Chairman of Sands China Ltd. and Chairman of Las Vegas Sands Corp.

**The Defamatory Allegation**

14.     The Defendant's allegation that the Plaintiff is "foul-mouthed" as published to readers of The Wall Street Journal is, in its ordinary and natural meaning, defamatory of the Plaintiff and is untrue.

15.     "Foul-mouthed" in the context of the Article meant and was understood to mean that the Plaintiff, in his office as Chairman of Sands China Ltd. and/or Las Vegas Sands Corp., used in business meetings when addressing colleagues and subordinates:

(1)     obscene, profane, or scurrilous language;

(2)     abusive, ~~blasphemous,~~ coarse and offensive language;

– 4 –

    (3)    rude and lewd language;.

16.    This false allegation amounts to a serious libel on the Plaintiff and has caused him considerable distress and embarrassment.

17.    The description of the Plaintiff as being "foul-mouthed" is even more damaging, distressing and embarrassing in that it was published by the Defendant with the intention of disparaging the Plaintiff in his office as Chairman of two major listed companies and was re-published to readers of The Wall Street Journal being predominately members of the business community worldwide.

18.    The Plaintiff repeats paragraphs 1 to 5 above.  The Plaintiff is the founder and Chairman of two major listed companies.  Untrue and unwarranted attacks upon the character and reputation of the Plaintiff in his office as Chairman of both, necessarily impact upon both the reputation and standing of SCL and LVS and their market capitalizations.  The Plaintiff is a major shareholder in LVS and through LVS in SCL.

**Republication**

19.    The Defendant wrote the Article with the intention, as in fact was the result, that the Article :-

    (1)    Would be re-published in the three editions of The Wall Street Journal particularized above.

    (2)    Would in turn be re-published by a substantial number of other prominent and widely circulated media outlets worldwide.

    (3)    Would be made available permanently by the Dow Jones Group to subscribers on its website http://online.wsj.com.

– 5 –

20.     The Wall Street Journal is distributed or made available in most countries in the world with a readership predominately from the business community.

21.     The 2012 circulation figures of the three newspapers are claimed by The Wall Street Journal to be as follows :-

     (1)     The Wall Street Journal – 1,566,027.

     (2)     The Wall Street Journal Asia – 83,004.

     (3)     The Wall Street Journal Europe – 66,522.

22.     The Article has, during the period from 5th December, 2012 until at least the date hereof, been available and will continue to be made available to subscribers to the website http://online.wsj.com.   The number of digital subscribers to the website is said by the Audit Bureau of Circulations to be 794,594 for the 6 months ending 30th September, 2011~~2~~, subject to audit.

**Aggravated and/or Exemplary Damages**

23.     In support of his claim to aggravated and/or exemplary damages the Plaintiff will rely on the following :-

     (1)     The Article in question was a news report and not an editorial.  It was one of a series of 14 articles over a period commencing in October 2010 written by the Defendant of and concerning the Plaintiff.  Responsible journalistic practice is to attribute statements of fact to their maker(s) and to avoid expressing journalistic or personal opinion.  This practice was not followed by the Defendant when writing the Article and nor was paragraph 1 of the Journalists' Code of Professional Ethics issued by the Hong Kong Press

– 6 –

Council Limited (the "Code") followed.  Paragraph 1 of the Code provides that "Journalists should handle news information with an attitude of seeking truth, fairness, objectivity, impartiality and comprehensiveness.  Journalists should strive to ensure accuracy of their reports.  They should not mislead the public by quoting out of context, distorting facts or twisting original meaning".

~~Particulars~~

~~(a)~~   The statement that the Plaintiff was "foul-mouthed" was not attributed to any individual in contrast to the statement concerning Jacobs that was attributed to "colleagues".

~~(b)~~   ~~The absence of such attribution to a named source is evidence from which the inference can be drawn that the allegation of the Plaintiff being "foul-mouthed" was only an expression of opinion on the part of the Defendant; not fact.~~

(2)   Further or alternatively, responsible journalistic practice is to avoid any, or any potential, conflict of interest.  This practice was not followed by the Defendant when writing the Article, nor was the actual or potential conflict declared and nor were paragraphs 5 or 5.3 of the Code followed.  Paragraph 5 of the Code provides "Journalists should avoid conflict of interest.  Under no circumstance should they be influenced by political, economic and other interests related to themselves, their families or their employers".  Paragraph 5.3 of the Code provides "Journalists should not write or comment on business or other organizational matters in which they have a stake.  Journalists should declare their interest should they be assigned to report or comment on matters in which they have an interest".

– 7 –

<u>Particulars</u>

(a)   The Defendant failed to disclose her friendship with Jacobs which commenced in 2009.

(b)   The Defendant failed to disclose that her friendship with Jacobs was such that in late 2011 or early 2012 she took a side trip to Atlanta Georgia to have lunch with Jacobs during a business trip from Hong Kong to the U.S.

(c)   That on 19th September, 2012 in pending Court proceedings in the U.S., (i) Jacobs confirmed the Defendant as a friend and (ii) confirmed the fact of the lunch with the Defendant in Atlanta.

(d)   Contrary to paragraphs 5 and 5.3 of the Code, the Defendant made no declaration of any of the above matters to readers of The Wall Street Journal but instead wrote and published the Article.

(3)   The Plaintiff repeats paragraph 18 above.  The allegation was made of the Plaintiff not just personally but more damagingly of him in his office as Chairman of SCL and LVS.

(4)   The Defendant prepared and published the allegation of "foul-mouthed" without any attempt to verify the facts with the Plaintiff or afford him any opportunity to comment on the allegation and in circumstances where the Article had no urgency attached to it requiring immediate publication such as to make verification, or comment from, the Plaintiff impracticable.

(5)   The Plaintiff repeats paragraph 19(3) and 22 above.  The Article continues to be available on the internet.

– 8 –

24.   The Defendant published the allegation of "foul-mouthed" knowing it to be false or without basis or being reckless in relation thereto, in the expectation that the prospect of financial gain to the Defendant would outweigh any compensatory damages awarded against her.

**Injunction**

25.   Unless restrained by the Court the Defendant will continue to publish the allegation or similar words defamatory of the Plaintiff.

And the Plaintiff claims :-

(1)   Damages, including aggravated, exemplary and special damages, for defamation.

(2)   An Injunction to restrain the Defendant from publishing the allegation or similar allegations defamatory of the Plaintiff.

(3)   Costs.

(4)   Further or other relief.

~~Dated the 1st day of March, 2013.~~

~~D E A C O N S~~
~~Solicitors for the Plaintiff~~

Dated the   1st   day of   June   , 2015.

**PAUL SHIEH S.C.**
**EVA SIT**
Counsel for the Plaintiff

**DEACONS**
Solicitors for the Plaintiff

– 10 –

**<u>Statement of Truth</u>**

I verily believe that the facts stated in this Amended Statement of Claim are true.


Sheldon Gary Adelson
The Plaintiff in Sheldon Gary Adelson v. Kate O'Keeffe

HCA 342/2013

**IN THE HIGH COURT OF THE**

**HONG KONG SPECIAL ADMINISTRATIVE REGION**

**COURT OF FIRST INSTANCE**

**ACTION NO. 342 OF 2013**

---

BETWEEN

    SHELDON GARY ADELSON                          Plaintiff

                      and

    KATE O'KEEFFE                                Defendant

---

---

**AMENDED STATEMENT OF CLAIM**

---

~~Dated the 1st day of March, 2013.~~
~~Filed the 5th day of March, 2013 at 4:30 o'clock in the afternoon.~~
Dated the 1st day of June , 2015
Filed the 1st day of June , 2015 at 4:05 o'clock in the ~~fore~~/afternoon.

**DEACONS**
5th Floor
Alexandra House
18 Chater Road
Central
Hong Kong

Tel: 28259211
Fax: 28100431

JMR:JC:A
241768

# EXHIBIT 4

Amended as in red this 3rd day of September 2014
pursuant to the Order of Deputy High Court Judge Leung
dated 12 August 2014.

HCA 342 / 2013

## IN THE HIGH COURT OF THE

## HONG KONG SPECIAL ADMINISTRATIVE REGION

## COURT OF FIRST INSTANCE

## NO. 342 OF 2013

———————

**BETWEEN**

|  |  |
|---|---|
| **SHELDON GARY ADELSON** | **Plaintiff** |
| **and** | |
| **KATE O'KEEFFE** | **Defendant** |

———————

## AMENDED DEFENCE

---

### Introduction

1.  This Defence is intended to be responsive to the Statement of Claim dated 1 March 2013.

2.  This Defence adopts the definitions used in the Statement of Claim, and references to paragraph numbers in this Defence are to paragraph numbers in the Statement of Claim, except as stated otherwise.

3.  Insofar as not expressly traversed herein, the contents of the Statement of Claim are denied.

### The Parties

4.  In respect of paragraph 1, it is admitted only that:

    4.1.  the Plaintiff is an internationally renowned businessman;

    4.2.  the Plaintiff is the Chairman of both SCL and LVS;

4.3.   SCL is listed on the Hong Kong Stock Exchange; and

4.4.   LVS is listed on the New York Stock Exchange.

Save as aforesaid, paragraph 1 is not admitted.

5.    The Defendant has no knowledge of the matters pleaded in paragraphs 2 to 4 inclusive and makes no admission thereto.

6.    Paragraph 5 is admitted.

7.    The Defendant has no knowledge of the matters pleaded in paragraph 6 and makes no admission thereto.

8.    In respect of paragraph 7, it is admitted that the Defendant is a journalist who writes material for publications of Dow Jones & Company, Inc, including The Wall Street Journal, The Wall Street Journal Asia and The Wall Street Journal Europe. It is further averred that:

8.1.   the Defendant has worked for Dow Jones & Company, Inc since 30 June 2008, first in Singapore and then, from 1 January 2010, in Hong Kong (covering Hong Kong and Macau, as an employee of Dow Jones Information Services International (HK) Ltd, a subsidiary of Dow Jones & Company, Inc);

8.2.   the Defendant is highly-regarded and, inter alia, was in 2012 awarded Dow Jones Newswires' highest honour – the annual William R. Clabby Dow Jones Newswires Award - for her reporting;

8.3.   the Defendant has particular experience in reporting on casino and gambling-related issues and / or affairs.

Save as aforesaid, paragraph 7 is not admitted.

**The Article**

9.    Paragraphs 8, 9 and 10 are admitted.

10.   Paragraph 11 is admitted.

11.    Paragraph 12 is denied. It is averred that the Article was actually stated to be co-written by the Defendant and another journalist and employee of Dow Jones & Company, Inc, Alexandra Berzon, and credited a third person, Alicia Mundy, as having contributed to the Article. It is further averred that notwithstanding the fact that Ms. Berzon co-wrote the Article with the Defendant, and Ms. Mundy contributed to the Article, that the Plaintiff has deliberately chosen to bring these proceedings against the Defendant in her sole name only. The Defendant repeats paragraph 17 below.

**Reference to the Plaintiff**

12.    In respect of paragraph 13, it is admitted that the term "foul-mouthed" was used to refer to the Plaintiff. It is averred that the Article was part of a series of articles reporting on the gaming industry in Macau and that this Article primarily described the "wrongful termination" dispute and related U.S. litigation (in Nevada and Florida) between Mr. Steve Jacobs (former Chief Executive of SCL) and the Plaintiff ("**US Lawsuits**"), and the resulting heightened scrutiny by regulators into gambling industry practices in Macau. Save as aforesaid, paragraph 13 is denied. It is specifically denied that the term "foul-mouthed" was in any way used or intended to be used as an "allegation" as pleaded.

**The term "foul-mouthed"**

13.    Paragraph 14 is denied. It is averred that the term "foul-mouthed" complained of meant and was understood to mean only that the Plaintiff had a tendency to use offensive, bad and / or coarse language. It is denied that the term "foul-mouthed" as used in the Article bore, or was understood to bear or was capable of bearing any meaning defamatory of the Plaintiff. The Defendant will rely, *inter alia*, on the subsequent media reports of these proceedings (including the particulars under paragraph 14(8) below) to

~~demonstrate that the term complained of has not been understood to bear or be capable~~
~~of bearing any meaning defamatory of the Plaintiff.~~

14.   Further, in its natural and ordinary meaning, the said term is true in substance and fact.

### Particulars

(1)   In 1999, the Plaintiff was verbally abusive to Temple Beth Sholom synagogue Rabbi Felipe Goodman in the latter's office in Las Vegas, following the synagogue's decision to hold a fundraiser at The Four Seasons rather than at the Plaintiff's own resort, The Venetian. During that meeting, the Plaintiff berated Rabbi Goodman to such extent that the Rabbi was reduced to tears.

(2)   During a telephone call in December 2001, the Plaintiff swore at Richard Suen, a Hong Kong business man, referring to Mr Suen in the following manner (or words to very similar effect): "*I never met someone who was so **fucking** bitter. You don't know **shit** about the financing of the business. I need this **fucking** Taiwanese because I need the money.*" [Emphasis added]

(3)   In or around spring 2002, during dinner at the Chinese restaurant at The Regent Hong Kong - then a hotel in Kowloon - in the context of discussing litigation proceedings against him or LVS in Las Vegas, the Plaintiff said the following (or words very similar): "*Can you change the **fucking** judge? He's nothing but a **fucking** pain in the ass.*" [Emphasis added] These remarks were addressed to former Nevada Governor Richard Bryan who was present at that dinner.

(4)   During the filming of the documentary "King of the Strip" produced by the British Broadcasting Corporation and The Learning Channel, and featuring the construction and subsequent opening in May 1999 of The Venetian (Las Vegas), the Plaintiff, knowing that he was being filmed and that his behaviour and what he said could be broadcast on television, said the following to a contractor in the

context of discussing the colour of the windows: "*I'm going to get God damn upset at you*". The word "God" was bleeped out.

(5)   The Plaintiff launched an abusive tirade against his former security staff and personal driver, Kwame Luangisa in or around March 2011, which (inter alia) caused Mr Luangisa to resign on 25 March 2011.

(6)   During a US court deposition taken by law firm Campbell & Williams in 2006, the Plaintiff was discourteous, rude and arrogant.

(7)   During a deposition given by the Plaintiff in the US Lawsuits (Florida) on 23 October 2012, the Plaintiff, while listing things he said could potentially hurt his reputation, said the following: "*Murder, rape, dismembering, **punching wise-ass attorneys in the face**, all of that might hurt my reputation. **Might**.*" [emphasis added]

(8)   During a meeting with Mr. Jacobs (which took place prior to Mr. Jacobs' termination in July 2010), Mr. Jacobs reported to the Plaintiff the outcome of a meeting that Mr. Jacobs had had with Macau's then-Chief Executive, Edmund Ho, and told the Plaintiff that the then-Chief Executive would not take any actions to enable the proceeds of a sale of SCL's "Four Seasons" apartments to be included in SCL's valuation for the purpose of SCL's public listing. The Plaintiff replied saying that **Chief Executive Ho** had "*promised*" him Strata-Title [required to attribute the sale proceeds to SCL's valuation] and that Chief Executive Ho was reneging on his "*promise*". The Plaintiff then asked Mr. Jacobs to convey a message to Chief Executive Ho, referring to him as a "*son of a bitch*", that the Plaintiff had settled a lawsuit paying $40 million dollars to keep Chief Executive Ho out of jail and that Chief Executive Ho owed Adelson Strata-Title as a result.

(1) In an article dated 27 December 1999 by Mike Zapler in the *Las Vegas Review-Journal* (which says it is Nevada's largest newspaper), it was reported how the Plaintiff had been verbally abusive to Temple Beth Sholom synagogue Rabbi Felipe Goodman in Las Vegas following the synagogue's decision to hold a fundraiser at The Four Seasons rather than at the Plaintiff's own resort, The Venetian: *"...Adelson visited temple Rabbi Felipe Goodman in his office. Carrying his young son in his arms, he berated the rabbi, calling him unfit to lead the synagogue and driving Goodman to tears. 'There were tears, but they were not tears of hurt, they were tears of disillusionment', said Felipe Goodman...I've worked very hard to build the temple and to build the Jewish community, and it was very disillusioning when someone came into my office and was* **so verbally abusive**. *I was very upset because* **no one had ever talked to me like he talked to me**." [emphasis added] The same incident was also reported by Connie Bruck in her profile of the Plaintiff published in *The New Yorker* on 30 June 2008 under the headline "*The Brass Ring — A multibillionaire's relentless quest for global influence* " (**"Bruck Profile"**)

(2) In a decision of the Superior Court of Massachusetts, *Mitchell Adelson et al v. Sheldon Adelson et al* 2001 WL 717120 (Mass.Super.) (a lawsuit brought by the Plaintiff's two adopted sons against him), the US judge said this: "*It is not inappropriate for me to preface my formal Findings of Fact by noting that this litigation, like so many family disputes, has tended to encourage all the Adelson parties to display deplorable rancor, bad feelings, and* **loutish behaviour**." [emphasis added]

(3) In the Bruck Profile, Connie Bruck described a meeting between the Plaintiff and Martin Indyk, the director of the Brookings Institution's Saban Center for Middle

East Policy, in late 2007 as follows: "*According to a person familiar with what happened at the meeting, Adelson berated Indyk for hosting 'terrorists' like Fayyad, who he said was a founder of Fatah.*"

(4)  In an article in the Review-Journal dated 14 June 2011 reporting on law suits filed by the Plaintiff's former security staff and personal driver against the Plaintiff for unpaid overtime pay, it was stated that "*Luangisa [Kwame Luangisa, the Plaintiff's former personal driver] said he resigned on March 25 [2011] following a 'particularly abusive tirade by Adelson' and believes he's owed more than $100,000.*" [emphasis added]

(5)  In an article by Steve Green of the *Las Vegas Sun* dated 2 October 2011 bearing the headline "*Adelson seeks contempt order over airing of deposition video*" describing the Plaintiff's application for a contempt order against Las Vegas law firm Campbell & Williams for the airing of a 2006 video showing the Plaintiff being deposed in US court proceedings, the Plaintiff was described as follows: "*As for the video, Campbell & Williams said it 'graphically demonstrated a petulant, rude and dictatorial witness (Adelson) who was treated with such courtesy and restraint by Mr. Campbell that opposing counsel actually thanked Mr. Campbell for his professionalism'*" [emphasis added]

(6)  In a deposition given by the Plaintiff in the US Lawsuits (Florida) on 23 October 2012, the Plaintiff, while listing things he said could potentially hurt his reputation, apparently referred to the deposing lawyer: "*Murder, rape, dismembering, punching wise-ass attorneys in the face, all of that might hurt my reputation. Might.*" [emphasis added]

(7)  In a declaration dated 15 February 2013 given by Mr. Jacobs in the US Lawsuits (Nevada), Mr. Jacobs described a meeting he had had with the Plaintiff (which

meeting was prior to the publication of the Article). In that meeting, Mr. Jacobs had reported to the Plaintiff the outcome of a meeting that Mr. Jacobs had had with Macau's then-Chief Executive, Edmund Ho, and told the Plaintiff that the then-Chief Executive would not take any actions to enable the proceeds of a sale of SCL's "Four Seasons" apartments to be included in SCL's valuation for the purpose of SCL's public listing. Mr. Jacobs described the Plaintiff's response to that information as follows: *"When I informed Adelson of Chief Executive Ho's position, Adelson became enraged and stated that Chief Executive Ho had "promised" him Strata Title [required to attribute the sale proceeds to SCL's valuation] and that Chief Executive Ho was reneging on his "promise". Adelson directed me to convey a message to Chief Executive Ho: Adelson wanted me to inform the "son of a bitch" that Adelson had settled a lawsuit paying $40 million dollars to keep Chief Executive Ho out of jail and that he (Ho) owed Adelson Strata Title as a result."* [emphasis added]

(8) In commentary published online on 7 March 2013 bearing the headline *"Likely foul and filthy"*, Hugh Jackson, a Las Vegas television host for a political program, said this: *"Sheldon Adelson ...with his limitless billions arguably renders him one of the most influential warmongers in the world today. I don't know if Adelson is 'foul-mouthed'. Part of me hopes he isn't because it's unsettling to think we might have something in common. But the journalist probably should have just left out the word 'mouthed' in any case."*

(9) The Defendant reserves the right to refer to and rely on further particulars at trial.

15. Paragraph 15 is denied. The Defendant repeats paragraph 13 of this Defence. Further, if, which is denied, the said term had the meanings or was understood to have the

meanings pleaded in paragraph 15 of the Statement of Claim, the said term was true in substance and fact.

### Particulars

(1)   The Defendant repeats the particulars under paragraph 14(1) to (8) inclusive above.

16.   Further and / or alternatively, the said term, in the context of the Article, was a fair comment on matters of public interest. ~~namely the status of the high profile US Lawsuits and the characters of the key players involved (namely Mr. Jacobs and the Plaintiff) in such US Lawsuits, as well as the connected regulatory probes and investigations into the Macau gaming industry (and including into LVS and SCL) which the US Lawsuits have spawned.~~

### Particulars

(1)   The Plaintiff is an internationally renowned businessman and the Chairman of LVS and SCL, as to which the relevant parts of paragraph 1, and paragraph 5, of the Statement of Claim are adopted.

(2)   The Plaintiff is party to the extremely high profile US Lawsuits, which have not only given rise to U.S. bribery investigations and Hong Kong and Macau probes into LVS and / or SCL but have also cast an extremely unwelcome spotlight on other U.S. casino operators in the lucrative Macau casino industry.

(3)   Such heightened regulatory scrutiny has already cost LVS close to US$ 60 million in legal fees (by the end of 2012), as well as generated much concern among those other U.S. casino operators.

(4)   The Plaintiff himself is one of two characters central to both sides of the story: his company is the subject of the regulator probes and his treatment of Mr. Jacobs

(and related defamation proceedings brought by the Plaintiff against Mr. Jacobs) is the subject of the US Lawsuits. Mr. Jacobs himself is the other protagonist.

(5)   Further, the Plaintiff has sought for himself a reputation in the eyes of the public to be a man of noble character, and a philanthropist. The Defendant refers to paragraph 1 and 6 of the Statement of Claim. The term complained of (in context) is relevant to this reputation and therefore in the public interest.

(5)   The term complained of was used to contrast the Plaintiff's temperament to that of Mr. Jacobs and, in that way, to set the stage for the working personalities of, and relationship between, the Plaintiff and Mr. Jacobs, the fertile ground for the ensuing employment dispute and, subsequently, US Lawsuits and the aftermath to the US Lawsuits.

(6)   The term complained of (in context) was used to describe the character, personality, disposition and style of the Plaintiff, and therefore a comment.

(7)   The term complained of (in context) clearly indicates that the factual basis for the comment was Plaintiff's general behaviour in respect of language.

(6)(8)   The term complained of was used in the context of the particulars pleaded under paragraph 14(1) to (8) inclusive of this Defence above, as well as premised on the fact The Defendant repeats the particulars under paragraph 14(1), (5) and (6) of this Defence above (which incidents were within the Defendant's knowledge at the time of the publication of the Article), and avers that the Defendant has had at least ten sources (seven current or former LVS or SCL employees, and three business associates familiar with the Plaintiff) who described to her incidents in which the Plaintiff had used foul language in their presence and / or confirmed to her that the term "foul-mouthed" was an adjective which truthfully described the Plaintiff.

(7)(9)   In the premises, therefore, the term complained of was a fair comment in the context of the Article in making the comment that the Plaintiff's style and personality was very different to that of Mr Jacobs.

17.   Paragraph 16 is denied. It is specifically denied that the Plaintiff has suffered "considerable distress and embarrassment" and the Plaintiff is put to strict proof thereof. If and so far as it is necessary to do so, the Defendant will rely on:

17.1. the Plaintiff's reputation for "bullying" persons, and in particular representatives of the press, whom he perceives as his opponents, or potential opponents, in some way:

**Particulars**

(1)   Not including these proceedings and the US Lawsuits (Florida), the Plaintiff has filed eight defamation lawsuits over the past seven to eight years alone. Full particulars (which will be known to the Plaintiff) can be provided at trial if and as necessary.

(2)   In an article in *The Daily Beast* dated 28 February 2013, bearing the headline *Sheldon Adelson, the Billionaire Who Bankrupted Me,* John L. Smith (a defendant in one of the defamation lawsuits referenced in particular (1) above), wrote the following: *"The bullyboy of Las Vegas Boulevard is at it again. Casino billionaire Sheldon Adelson this week filed another defamation suit against a journalist. This time, The Wall Street Journal's Hong Kong-based reporter Kate O'Keeffe is the object of his ire. She has been busy probing the depths of Adelson's Macau casino gambit ... The Adelson suit contains the telltale signs of litigation intended more to harass than prevail."*

(3)   In the Bruck Profile, Connie Bruck further described the following events:

a. ~~in an article written about the defamation suit brought by the Plaintiff against John L. Smith referred to in particulars (1) and (2) above, which appeared in the *Review-Journal* on 12 October 2007, the editor, Thomas Mitchell pointed to litigation against both the *Sun* and John L. Smith and said of the Plaintiff: "*This whole series of events is nothing more nor less than trying to coerce everyone in journalism to not write anything he doesn't like.*"~~

b. ~~in a letter written to the *Review-Journal* in September 1998 by Shelley Berkley (the U.S. Representative for Nevada's 1st congressional district from 1999 until January 2013), who served as the Plaintiff's vice-president of legal and governmental affairs in the 1990s, in response to a letter written by the Plaintiff to the same *Review-Journal*, Ms. Berkley said this: "*Over time, I observed Mr. Adelson plot vendettas against anyone whom he believed stood in his way. However minuscule the perceived affront, he was certain to go ballistic, using his money and position to bully any 'opponent' – great or small – into submission...*".  [emphasis added]~~

~~(4) Mr. Ron Reese, the LVS PR representative was on a telephone call with the Los Angeles Dow Jones & Company, Inc bureau chief, who oversees Las Vegas coverage, after these proceedings had been issued and enquired if the Defendant would be removed from covering LVS/SCL as a consequence of her being named the Defendant herein.~~

~~The Defendant also repeats the particulars under paragraph 14(1) to (8) inclusive above and paragraph 18 below.~~

17.2. the Plaintiff's ulterior motive in bringing these proceedings against the Defendant solely:

**Particulars**

(1)    The Defendant repeats paragraph 11 the particulars under paragraph 17.1 of this
Defence above.

(2)    Mr. Ron Reese, the LVS PR representative, was on a telephone call with the Los
Angeles Dow Jones & Company, Inc bureau chief, who oversees Las Vegas
coverage, after these proceedings had been issued and enquired if the Defendant
would be removed from covering LVS/SCL as a consequence of her being named
the Defendant herein.

(2)(3)    In connection with the US Lawsuits, and in the context of the Defendant's alleged
relationship with Mr. Jacobs, the Plaintiff is has separately seeking sought a third
party discovery order against Dow Jones & Company, Inc (which is contested
was rejected by the US courts), and has applied to obtain deposition evidence
from the Defendant in Hong Kong (also which is contested).

The Defendant also repeats the particulars under paragraph 14(1) to (8) inclusive and
paragraph 18 below.

18.    Save that it is admitted that the Plaintiff is the Chairman (and shareholder) of LVS and
SCL, paragraphs 17 and 18 are denied. It is specifically denied that:

18.1.    the Defendant used the term complained of with the intention of either
disparaging the Plaintiff in his office as Chairman of LVS and SCL or of
attacking his character and reputation;

18.2.    the Article was published or re-published (by The Wall Street Journal, not the
Defendant as pleaded) with such intention;

18.3.    the term complained of has had any impact upon the reputation and standing of
LVS and SCL (who are not anyway parties to these proceedings) and their

market capitalizations (in respect of which the Plaintiff is put to strict proof thereof).

It is further averred that the Plaintiff's character and reputation were not, or could not be, injured or diminished in any way by the term complained of. The Defendant repeats paragraphs 13 to 17 inclusive above.

**Republication**

19.   In respect of paragraph 19, it is admitted only that the Defendant co-wrote the Article with the expectation that it would be published by The Wall Street Journal. Save as aforesaid, paragraph 19 is denied. The Defendant repeats paragraph 18 of this Defence above.

20.   In respect of paragraph 20, it is admitted only that The Wall Street Journal is distributed or made available in many countries worldwide. Save as aforesaid, paragraph 20 is not admitted.

21.   The Defendant has no knowledge of the 2012 circulation figures pleaded in paragraph 21 and makes no admission thereto. The relevance of the same is denied.

22.   In respect of paragraph 22, it is admitted only that the Article has been available online since it was first published on 5 December 2012. Save as aforesaid, paragraph 22 is not admitted. In particular, the Defendant has no knowledge of the subscription figures pleaded in paragraph 22 and makes no admission thereto. The relevance of the same is denied.

**Damages**

23.   The Plaintiff's claim for aggravated and / or exemplary damages is denied. The Defendant repeats paragraphs 13 to 18 inclusive of this Defence above.

24.    Further and / or alternatively, the Defendant will rely on the following facts in mitigation of, or otherwise in relation to, the amount of damages claimed:

24.1.   the Plaintiff (including via Mr. Reese) was given ample opportunity to comment on the general subject matter of the Article, and did in fact do so:

**Particulars**

(1)    As arranged with the Defendant, the Defendant's co-author, Ms. Berzon, spoke to and / or was in email contact with Mr. Reese on several occasions (including on – but not limited to – 13, 14, 15, 16, 26 and 28 November 2012 and 3 December 2012) about the general subject matter of the Article prior to its publication and provided him with (repeated) opportunity to comment generally. Mr. Reese duly provided information for the Article.

(2)    The other contributor to the Article, Ms. Mundy, also personally interviewed the Plaintiff in or around the latter half of November 2012, during which interview the Plaintiff gave comments about the dispute between him and Mr. Jacobs and the related US Lawsuits. His comments were also used in the Article.

24.2.   the Plaintiff's ~~general bad~~ reputation in the directly relevant background context:

**Particulars**

(1)    In an article dated 27 December 1999 by Mike Zapler in the *Las Vegas Review-Journal* (which says it is Nevada's largest newspaper), it was reported how the Plaintiff had been verbally abusive to Temple Beth Sholom synagogue Rabbi Goodman in Las Vegas following the synagogue's decision to hold a fundraiser at The Four Seasons rather than at The Venetian: "...*Adelson visited temple Rabbi Felipe Goodman in his office. Carrying his young son in his arms, he berated the rabbi, calling him unfit*

*to lead the synagogue and driving Goodman to tears. 'There were tears, but they were not tears of hurt, they were tears of disillusionment', said Felipe Goodman...I've worked very hard to build the temple and to build the Jewish community, and it was very disillusioning when someone came into my office and was **so verbally abusive. I was very upset because no one had ever talked to me like he talked to me.**'* [emphasis added] The same incident was also reported by Connie Bruck in her profile of the Plaintiff published in *The New Yorker* on 30 June 2008 under the headline "*The Brass Ring – A multibillionaire's relentless quest for global influence.*" ("**Bruck Profile**")

(2)   In a decision of the Superior Court of Massachusetts, *Mitchell Adelson et al v. Sheldon Adelson et al* 2001 WL 717120 (Mass.Super.) (a lawsuit brought by the Plaintiff's two adopted sons against him), the US judge said this: "*It is not inappropriate for me to preface my formal Findings of Fact by noting that this litigation, like so many family disputes, has tended to encourage all the Adelson parties to display deplorable rancor, bad feelings, and loutish behaviour.*" [emphasis added]

(3)   In the Bruck Profile, Connie Bruck described a meeting between the Plaintiff and Mr. Indyk (director of the Brookings Institution's Saban Center for Middle East Policy), in late 2007 as follows: "*According to a person familiar with what happened at the meeting, Adelson berated Indyk for hosting 'terrorists' like Fayyad, who he said was a founder of Fatah.*"

(4)   In an article in the *Review-Journal* dated 14 June 2011 reporting on law suits filed by Mr Luangisa, (the Plaintiff's former security staff and personal driver), against the Plaintiff for unpaid overtime pay, it was stated that

"*Luangisa said he resigned on March 25 [2011] following a **particularly abusive tirade by Adelson'** and believes he's owed more than $100,000.*" [emphasis added]

(5)   In an article by Steve Green of the *Las Vegas Sun* dated 2 October 2011 bearing the headline "*Adelson seeks contempt order over airing of deposition video*" describing the Plaintiff's application for a contempt order against Las Vegas law firm Campbell & Williams for the airing of a 2006 video showing the Plaintiff being deposed in US court proceedings, the Plaintiff was described as follows: "*As for the video, Campbell & Williams said it 'graphically demonstrated a **petulant, rude and dictatorial witness (Adelson)** who was treated with such courtesy and restraint by Mr. Campbell that opposing counsel actually thanked Mr. Campbell for his professionalism'.*" [emphasis added]

(6)   In a deposition given by the Plaintiff in the US Lawsuits (Florida) on 23 October 2012, the Plaintiff, while listing things he said could potentially hurt his reputation, said the following: "*Murder, rape, dismembering, **punching wise-ass attorneys in the face**, all of that might hurt my reputation. **Might.**" [emphasis added]

(1)(7)   The Defendant repeats ~~the particulars under paragraph 14(1) to (8) inclusive, paragraph 16 and the particulars under paragraphs 17.1 (1) to (4) and~~ 17.2 (1) to (23) inclusive above.

~~24.3 - the contextual background in which the Article was published:~~

~~**Particulars**~~

(1)   ~~The Defendant repeats paragraph 13 and the particulars under paragraph 14(1) to (8), and paragraph 16(1) to (7), inclusive above.~~

24.4. 24.3.   the absolute absence of malice on the part of the Defendant:

**Particulars**

(1)   The Defendant repeats the particulars under paragraph 14(1) to (8) inclusive, and paragraph 16(1) to (7)(9) inclusive, above, and paragraphs 25 and 27 below.

25.   Save that it is admitted that paragraph 23(1) correctly quotes paragraph 1 of the Code and that the Article was a news report, paragraph 23(1) is denied.  It is:

25.1. specifically denied that:

1.   the Defendant did not, and does not, engage in responsible journalistic practice and / or comply with paragraph 1 of the Code;

2.   the Article was one of a series of 14 articles written by the Defendant and "concerning" the Plaintiff;

3.   without prejudice to the Defendant's reliance on the defence of fair comment in the alternative to justification, the term complained of was an expression of the Defendant's personal opinion; and

25.2. averred that:

1.   the Defendant did and does strive to ensure the accuracy of her material;

2.   the term complained of is true in substance and in fact; and

3.   at all material times the Defendant complied with the form and the spirit of the Code.

The Defendant repeats paragraphs 13 to 18 inclusive of this Defence above and paragraph 26 of this Defence below.

26.   It is averred that the same Code:

26.1. affirms the following key beliefs: (i) freedom of speech as basic human right; and

      (ii) freedom of press (guaranteed under the Basic Law) as an integral part of freedom of speech; and

26.2. provides that "*Journalists should protect their sources of information.*"

27.    In respect of paragraph 23(2), it is admitted that paragraph 23(2) correctly quotes paragraph 5 and 5.3 of the Code. It is also admitted that the Defendant knows Mr. Jacobs through her role as a reporter, that she had lunch with Mr. Jacobs in Atlanta, Georgia whilst in the U.S. on business in early 2012, and that during a deposition on 19 September 2012 in the US Lawsuits (Florida) Mr. Jacobs confirmed that he had had lunch with the Defendant in Atlanta, Georgia and stated that he knew the Defendant and considered her a friend. Save as aforesaid, paragraph 23(2) is denied. It is:

27.1. specifically denied that:

1.   the Defendant was subject to any, or any potential, conflict of interest in the context of writing, and having regard to the contents of, the Article;

2.   the Defendant was under any obligation to disclose her (professional) relationship with Mr. Jacobs or the fact that they had lunch in Atlanta, Georgia in or around April 2012 (the relevance of the same is anyway denied);

3.   the Defendant breached paragraph 5 or paragraph 5.3 of the Code; and

27.2. averred that:

1.   the Article was written objectively and without agenda;

2.   as far as the Defendant is concerned, her relationship with Mr. Jacobs was a professional one.

The Defendant repeats paragraphs 13 to 18 and paragraphs 25 and 26 of this Defence above.

28.    Paragraph 23(3) is denied. The Defendant repeats paragraph 18 of this Defence above.

29.   In respect of paragraph 23(4), it is denied that the Defendant (via his representatives) was not provided with the opportunity to comment on the general subject matter of the Article. The Defendant repeats paragraphs 13 to 18 inclusive, and the particulars under paragraph 24.1, of this Defence above. Save as aforesaid, paragraph 23(4) is not admitted.

30.   In respect of paragraph 23(5), the Defendant repeats paragraphs 19 and 22 of this Defence above.

31.   Paragraph 24 is denied. It is specifically denied that the Defendant eschews so-called "responsible journalistic practice" in favour of financial gain and / or that the Defendant is motivated by financial gain to the detriment of the accuracy and truth of the content of material written by her (including but not limited to the Article).   The Plaintiff's right to compensatory damages is again expressly denied. It is averred that in its natural and ordinary meaning the term complained of is true in substance and fact. The Defendant repeats paragraphs 13 to 18, and 24 to 27, inclusive of this Defence above.

32.   Paragraph 25 is denied. It is denied in particular that the term complained of is in any way defamatory of the Plaintiff and that the Plaintiff is entitled to an injunction as pleaded. It is again averred that in its natural and ordinary meaning the said term (or any similar term) is true in substance and fact. The Defendant repeats paragraphs 13 to 18 inclusive and paragraph 31 of this Defence above.

**Claims**

33.   The Defendant denies each and all of the Plaintiff's claims.

Dated 25 April 2013

CLIFFORD CHANCE
Solicitors for the Defendant

Dated 3 September 2014

*Clifford Chance*

**CLIFFORD CHANCE**
**Solicitors for the Defendant**

## STATEMENT OF TRUTH

I believe that the facts stated in this Defence are true.


Signed: ——————————————

Name: Kathryn O'Keeffe

Defendant

Date: ——————————————


I believe that the facts stated in this Amended Defence are true.

Signed:

Name: Kathryn O'Keeffe

Defendant

Date:   3  September  2014

HCA No. 342 / 2013

IN THE HIGH COURT OF THE

HONG KONG SPECIAL ADMINISTRATIVE REGION

COURT OF FIRST INSTANCE

ACTION NO. 342 OF 2013

_____

BETWEEN

SHELDON GARY ADELSON                                    Plaintiff

And

KATE O'KEEFFE                                                    Defendant

_____

AMENDED DEFENCE

_____

Dated this 25th day of April 2013

Filed this 25th day of April 2013

Re-Dated this 3rd day of September 2014

Re-Filed this 3rd day of September 2014

**CLIFFORD CHANCE**
Solicitors for the Defendant
28th Floor, Jardine House
One Connaught Place
Central, Hong Kong
Tel: 2825 8888
Fax: 2825 8800
Ref: ELYC.10-40546184.KSHS.YKW

DEACONS
MAIL RECEPTION
'14 SEP -3 17:09
ITEMS RECEIVED
BUT NOT CHECKED

HKG-1-1001442-v8A                                                                    10-40546184

# EXHIBIT  5

HCA 342/2013

IN THE HIGH COURT OF THE
HONG KONG SPECIAL ADMINISTRATIVE REGION
COURT OF FIRST INSTANCE
ACTION NO. 342 OF 2013

BETWEEN

SHELDON GARY ADELSON                    Plaintiff

and

KATE O'KEEFFE                           Defendant

R E P L Y

1.    Unless otherwise expressly stated:-

      (1)    references in this Reply to numbered paragraphs are references to numbered
             paragraphs in the Amended Defence filed on 3 September 2014; and

      (2)    the Plaintiff continues to adopt the abbreviations and nomenclature in the
             Statement of Claim.

2.    Save and insofar as it consists of admission and save insofar as the allegations
      therein contained are expressly admitted hereinbelow, the Plaintiff joins issue with
      the Defendant on her Amended Defence.

3.    The second sentence of paragraph 11 is admitted. The Plaintiff repeats paragraph
      23(2) of the Statement of Claim.  Save as aforesaid, paragraph 11 is not admitted.

4.    The Plaintiff joins issue with the Defendant on paragraph 12.  In particular, it is
      averred that:-

– 2 –

(1)   The "wrongful termination" dispute was between Jacobs and LVS and SCL, and the Plaintiff was not a party to the lawsuit by Jacobs against LVS and SCL either at the time of the 22 October 2010 article or at the time of the Article.

(2)   The Article was part of a series of articles written and/or co-authored by the Defendant between October 2010 and December 2012 (9 of which were published between June and December 2012) directed specifically at LVS and SCL and the Plaintiff personally.

(3)   The Article specifically targeted the Plaintiff and sought to draw a comparison between Jacobs and the Plaintiff.

5.   The Plaintiff joins issue with the Defendant on the meaning of "*foul-mouthed*" as pleaded in paragraph 13.

6.   Without prejudice to paragraph 4 above, paragraphs 14, 15(1), 31 and 32 are denied. As to paragraph 14:-

(1)   Sub-paragraph (1) is denied. Rabbi Felipe Goodman has never been "*berated*" or made to cry by the Plaintiff as alleged.

(2)   Sub-paragraph (2) is embarrassing as the Defendant has failed to particularize whether the alleged conversation contained the words pleaded or different words to similar effect. Without prejudice to the foregoing, sub-paragraph (2) is denied.

(3)   Sub-paragraph (3) is denied. It is averred that Richard Bryan, then Governor of Nevada and a United States Senator, was not in Hong Kong in 2002 and has not travelled to Hong Kong since the mid 1980s.

– 3 –

(4)    As to sub-paragraph (4), it is admitted that the Plaintiff appeared and spoke in the documentary but it is not admitted that the Plaintiff said the words pleaded in parenthesis.   It is in any event denied that those words can justify the meaning pleaded by the Defendant in paragraph 13.   It is averred that any words uttered by the Plaintiff on that occasion were uttered in jest and were so understood by the contractor to whom they were directed, who smiled upon hearing such utterance, and the atmosphere between the parties was amiable and friendly.

(5)    Sub-paragraph (5) is embarrassing as the Defendant has failed to particularize the exact words allegedly used in the conversation between the Plaintiff and Kwame Luangisa.   Without prejudice to the foregoing, sub-paragraph (5) is denied.   It is further averred that Mr. Luangisa was discharged.

(6)    Sub-paragraph (6) is denied.   Without prejudice to the Plaintiff's contention that "*discourteous, rude and arrogant*" does not bear the same meaning and is not equivalent to "*foul-mouthed*", it is averred that on the occasion referred to in sub-paragraph (6), it was Donald Campbell of Campbell & Williams who behaved in a discourteous, rude and arrogant manner.   Donald Campbell mistreated property belonging to LVS by throwing important papers on the floor despite the Plaintiff's request for the same to be placed on another table.

(7)    As to sub-paragraph (7):-

        (a)    it is admitted that the Plaintiff uttered the words in parenthesis;

        (b)    it is averred that the quoted sentence was part of an answer given by the Plaintiff in response to the question whether or not an investigation

0004

– 4 –

into money laundering would hurt his reputation, to which the Plaintiff
replied that

> "*Any investigation on any issue that is illegal would hurt my
> reputation. Murder, rape, dismembering, punching wise-ass
> attorneys in the face, all of that might hurt my reputation. Might.*"

(c)   it is further averred that the use of the expression "*wise-ass*" in such
context was meant as a humorous exaggerated response for effect to
underline the unnecessary nature of the question.

(8)   Sub-paragraph (8) is denied.  In respect of the alleged conversation between
the Plaintiff and Jacobs said to have taken place before July 2010, it is further
averred that:-

(a)   It was one of the business strategies of SCL to monetize its non-core
assets including the Four Seasons apart-hotel through one of three
means: (i) sale of the entire tower as one unit; (ii) sale of exclusive
rights to use individual units under a cooperative scheme; or (iii) if
approval to sub-divide the entire tower into separate lots for each unit,
sale of individual condominium-titled properties.  The aforesaid had
been disclosed in the documents in relation to its initial public offering
("**IPO**", including the Prospectus dated 16 November 2009,
"**Prospectus**") published by SCL pursuant to the requirements of the
Hong Kong Stock Exchange.

(b)   It was made clear in the Prospectus that the proposed sale of the Four
Seasons apart-hotel had not yet materialized, and SCL's ability to do
so was expressly listed as a "risk factor":-

0005

– 5 –

> "*Our ability to monetize our non-core real estate assets will be subject to market conditions, applicable legislation and the approval by the Macau Government's Chief Executive of the transfer of certain of our rights under our land concessions to a third-party purchaser. ...*"

(c)   It would not have been possible, under acceptable accounting standards, for SCL to include in its asset valuation for the purpose of the IPO projected revenue from proposed sale(s) for which it was not yet possible for title to pass.

(d)   The value of the Four Seasons apart-hotel had been properly reflected in the Prospectus as "net property and equipment" under "non-current assets".

(e)   The shares of SCL became listed on the Hong Kong Stock Exchange on 30 November 2009.

7.   As to paragraph 16:-

(1)   The opening sentence is not admitted.

(2)   Sub-paragraph (1) is admitted.

(3)   Sub-paragraph (2) is denied.  The Plaintiff repeats paragraph 4(1) above.

(4)   Sub-paragraph (3) is not admitted.

(5)   Without prejudice to the contention that the plea is embarrassing, sub-paragraph (4) is not admitted.

– 6 –

(6)   Save it is averred that the Plaintiff has over the years donated substantial amounts to a variety of civic and charitable causes worldwide, the first sentence of sub-paragraph (5) is not admitted.

(7)   The last sentence of sub-paragraph (5), sub-paragraph (6) and sub-paragraph (7) are denied. It is specifically denied that "foul-mouthed" in the contexts pleaded (which are denied) was or could be a comment.

(8)   Without prejudice to the Plaintiff's contention that this plea is lacking in particulars and hence defective, sub-paragraph (8) is not admitted. The Plaintiff repeats paragraphs 6(1), (5) and (6) above.

(9)   By reason of the foregoing, sub-paragraph (9) is denied.

8.   In answer to paragraph 17.2:-

(1)   The opening sentence is denied.

(2)   As to sub-paragraph (1), the Plaintiff repeats paragraph 3 above.

(3)   Sub-paragraph (2) is not admitted. It is further averred that the Plaintiff had no prior knowledge of and did not authorize or direct Ron Reese to make any telephone calls or communication with Los Angeles Dow Jones & Company.

(4)   As to sub-paragraph (3), it is admitted that defamation proceedings have been brought by the Plaintiff in Florida against Jacobs in Case No. 12-28537 in respect of the latter's statement that the Plaintiff had personally approved an alleged "prostitution strategy" of SCL's casinos in Macau. In the course of those proceedings, the Plaintiff applied for subpoenas duces tecum against Dow Jones & Company, Inc and a Letter of Request against the Defendant.

0007

– 7 –

The Decision of Justice Mills setting aside one of the subpoenas was only handed down on 31 May 2013, whereas the Writ herein was issued on 22 February 2013 and the Statement of Claim filed on 1 March 2013. The Letter of Request was stayed and a ruling on it was never issued. The defamation proceedings against Jacobs were dismissed by summary judgment on 24 February 2014, which dismissal is on appeal to the appellate court of Florida.

9.    The Plaintiff joins issue with the Defendant on paragraph 24.

10.   In answer to paragraphs 24.1 and 29:-

(1)    It is admitted that Ron Reese had conversations and email contact with Alexandra Berzon prior to the publication of the Article on the dispute between Jacobs and LVS and SCL generally.

(2)    However, at no time during the aforesaid communication had Alexandra Berzon mentioned or referred to the use of the phrase "foul-mouthed" on the Plaintiff, nor had Ron Reese or the Plaintiff been given any opportunity to comment on such use.

(3)    It is admitted that Alicia Mundy interviewed the Plaintiff in late 2012 in respect of an article published on 4 December 2012 entitled "Adelson to Keep Betting on the GOP", which concerned the Plaintiff's intentions in relation to the Republican campaign. At no time during the aforesaid interview had Alicia Mundy mentioned or referred to the use of the phrase "foul-mouthed" on the Plaintiff, nor had the Plaintiff been given any opportunity to comment on such use.

11.   As to paragraph 24.2:-

– 8 –

(1)   Sub-paragraph (1) is denied.  The Plaintiff repeats paragraph 6(1) above.

(2)   As to sub-paragraph (2):-

    (a)   In *Mitchell Adelson et al v Sheldon Adelson et al* (Massachusetts Superior Court Civil No. 97-5010), the two adopted sons of the Plaintiff sued him for fraud and breach of fiduciary duty in relation to the sale of certain shares by the adopted sons to the Plaintiff.  The adopted sons' claims were dismissed by the Superior Court, failed on appeal to the Massachusetts Appeals Court, and leave to appeal to the Supreme Judicial Court was also refused.

    (b)   It is admitted that the aforesaid Decision of the Massachusetts Superior Court contained the statement in parenthesis in sub-paragraph (2), which was made in the following context and the Decision went on to find:-

        " … *the evidence as a whole, as well as [the Plaintiff's] demeanor while in my direct observation, communicated the flavour of his paternal – one might accurately say, patriarchal – attitude. …*"

    (c)   In the premises, it is denied that "*loutish behaviour*" bears the same meaning and can be understood to mean "*foul-mouthed*".

(3)   Save that the statement in parenthesis was taken from an article entitled "The Brass Ring – A multibillionaire's relentless quest for global influence" written by Connie Bruck in The New Yorker on 30 June 2008 and there was a meeting between the Plaintiff and Martin Indyk in November 2007, sub-paragraph (3) is not admitted.

– 9 –

(4)   Save that the statement in parenthesis was taken from an article entitled "Security forces, driver sue Las Vegas Sands over pay" in the Review-Journal dated 14 June 2011, sub-paragraph (4) is denied.  The Plaintiff repeats paragraph 6(5) above.

(5)   Save that the statement in parenthesis was taken from an article entitled "Adelson seeks contempt order over airing of deposition video" by Steve Green published on 2 October 2011, sub-paragraph (5) is denied.  The Plaintiff repeats paragraph 6(6) above.

(6)   Sub-paragraph (6) is denied. The Plaintiff repeats paragraph 6(7) above.

12.   Paragraph 24.3 is denied.  The Plaintiff repeats paragraphs 6 and 7 above.

13.   By reason of the foregoing, the Plaintiff joins issue with the Defendant on paragraph 25.2.

14.   As to paragraph 26:-

(1)   Paragraph 26.1 is admitted.  It is averred that the matters pleaded in paragraph 26.1 constitute part of "Our Beliefs" which is separate from and does not form part of the "Code of Practice" or the "Guidelines for Practice" of the Code.

(2)   Paragraph 26.2 is admitted.

15.   As to paragraph 27:-

(1)   The evidence of Jacobs given in a deposition on 19 September 2012 was that he was friends with the Defendant, they knew each other since the time when

– 10 –

he was employed as chief executive officer of SCL in Macau, and the Defendant when flown in from Hong Kong to the United States made a separate trip to Atlanta just to have lunch with him during which they only talked about toaster ovens (as with the majority of their other conversations which Jacobs admitted to have had with the Defendant).

(2)    Paragraph 27.2 is denied.  The Plaintiff repeats the matters pleaded above and paragraph 23 of the Statement of Claim.

Dated this   27th   day of November 2014.

Paul Shieh SC
Eva Sit
Counsel for the Plaintiff

DEACONS
Solicitors for the Plaintiff

0011

**Statement of Truth**

The Plaintiff believes that the facts stated in this Reply are true.

Name: Sheldon G. Adelson

The Plaintiff in Sheldon Gary Adelson vs. Kate O'Keeffe

Date:

HCA 342/2013

IN THE HIGH COURT OF THE
HONG KONG SPECIAL ADMINISTRATIVE REGION
COURT OF FIRST INSTANCE
ACTION NO. 342 OF 2013

BETWEEN

SHELDON GARY ADELSON                                    Plaintiff

and

KATE O'KEEFFE                                          Defendant

## R E P L Y

Dated the 27th day of November, 2014.
Filed the 27th day of November, 2014 at              o'clock in the
fore/afternoon.

**DEACONS**
5th Floor
Alexandra House
18 Chater Road
Central
Hong Kong

Tel: 28259211
Fax: 28100431

JMR:JC:A
241768

0013

# EXHIBIT  6

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

IN RE APPLICATION OF KATE O' KEEFFE )
TO ISSUE SUBPOENA FOR TAKING )        Case No. 2:14-cv-01518-RFB-CWH
DEPOSITION OF PRODUCTION OF )
DOCUMENTS IN FOREIGN )                **ORDER**
PROCEEDING. )
_____ )

This matter is before the Court on Movants Las Vegas Sands Corp. ("LVSC"), Daniel J. Briggs

("Briggs"), and Ron Reese's ("Reese"), (collectively "movants"), motion to quash the subpoenas (doc.

# 19), filed November 12, 2014.   The Court also considered Rabbi Felipe Goodman's ("Rabbi

Goodman") joinder to the instant motion (doc. # 27), filed November 21, 2014; movants' supplement

to the motion (doc. # 32), filed November 25, 2014; Kate O' Keeffe's ("O' Keeffe") response (docs.

# 38, # 39), filed December 8, 2014; and, movants' reply (doc. # 41), filed December 18, 2014.[1]

**BACKGROUND**

On September 18, 2014, O' Keeffe filed ex parte applications for a court order to obtain

discovery for use in foreign proceedings pursuant to 28 U.S.C. § 1782(a). See Docs. # 1-5.

Specifically, O' Keeffe sought an order authorizing subpoenas to:  (1) LVSC; (2) Briggs, VP for

Investor Relations at LVSC; (3) Reese, VP for Public Relations at LVSC; (4) Brian Clark, Litigation

Support Manager for Lawyer Solutions Group LLC; and (5) Rabbi Goodman of the Temple Beth

Sholom, Las Vegas. Id. According to O' Keeffe, the documents and other materials subpoenaed will

be used in a lawsuit adjudicated in Hong Kong, People's Republic of China, to which she is a party.

_____

[1] The Court notes it also reviewed O' Keeffe's notice of opinion and order (doc. # 42), filed February 10, 2015.

O' Keeffe explains that the discovery sought will aid in her defense against a libel claim filed by LVSC's Chairman and CEO, Sheldon G. Adelson ("Adelson"), alleging that an article authored by O' Keeffe and published by the U.S., European, and Asian editions of the Wall Street Journal falsely referred to him as "foul-mouthed." Doc. # 1 at 3. O'Keeffe asserts that the subpoenaed parties have relevant information demonstrating Adelson's "tendency to use foul or otherwise offensive language." Id. at 6. The Court granted O' Keeffe's applications on October 21, 2014, but noted that the subpoenaed parties could file a motion to quash. See Doc. # 18; see also Docs. # 1-5. Thereafter, movants filed the instant motion. See Doc. # 19.

## DISCUSSION

### 1. Legal Standard

A district court may grant an application pursuant to 28 U.S.C. § 1782 if: (1) the person from whom the discovery is sought resides or is found in the district of the district court to which the application is made; (2) the discovery is for use in a proceeding before a foreign tribunal; and (3) the application is made by a foreign or internal tribunal or any interested person. 28 U.S.C. § 1782(a); see also In re Republic of Ecuador, No. 3:10-80225-CRB-EMC, 2010 WL 3702427, at *2 (N.D. Cal. Sep. 15, 2010). However, although a court has the authority under § 1782 to grant an application, it is not required to do so. Intel Corp. v. Advanced Micro Devices, Inc., 542 U.S. 241, 264 (2004). The U.S. Supreme Court identifies several factors that a court should take into consideration when ruling on a § 1782 application: (1) whether the material sought is within the foreign tribunal's jurisdictional reach and thus accessible absent § 1782 aid; (2) the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government, or the court or agency abroad to U.S. federal-court jurisdictional assistance; (3) whether the § 1782 request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States; and (4) whether the subpoena contains unduly intrusive or burdensome requests. In re Republic of Ecuador, 2010 WL 3702427, at *2 (citing Intel Corp., 542 U.S. at 264-65).

If a district court grants a § 1782 application, the subpoenaed party can move to quash the subpoena, but bears the burden of persuasion in the course of civil litigation. See In re Ex Parte Apple Inc., No. MISC 12-80013 JW, 2012 WL 1570043, at *1 (N.D. Cal. May 2, 2012); see also Heraeus

2

1 | Kulzer, GmbH v. Biomet, Inc., 633 F.3d 591, 597 (7th Cir. 2011) ("Once a section 1782 applicant
2 | demonstrates need for extensive discovery for aid in a foreign lawsuit, the burden shifts to the
3 | opposing litigant to demonstrate, by more than angry rhetoric, that allowing the discovery sought (or
4 | a truncated version of it) would disserve the statutory objectives.").

5 | **2. Analysis**

6 | This Court previously concluded it had the legal authority to grant O' Keeffe's ex parte
7 | applications for subpoenas. See Doc. # 18. The Court noted in its order that: (1) the subpoenaed
8 | parties reside in this district, (2) the discovery would be of use in the Hong Kong litigation, and (3)
9 | the application is brought by O' Keeffe, a party to that litigation. Id. Movants do not dispute that this
10 | Court has discretion to grant a § 1782 application. Instead, movants contend the second, third, and
11 | fourth Intel factors weigh in favor of granting their motion to quash.[2]

12 | **a. Second Intel Factor: Receptivity of the Hong Kong Court to U.S. Federal Court**
13 | **Jurisdictional Assistance**

14 | Movants contend the subpoenas should be quashed because O' Keeffe allegedly "bypassed"
15 | Hong Kong law and procedures governing discovery by failing to request the assistance of the Hong
16 | Kong Court to obtain the requested discovery, which casts doubt on the usefulness of the requested
17 | discovery and the Hong Kong Court's receptivity to admitting into evidence that discovery. Doc. #
18 | 19 at 5 (citing, among others, In re PIC Do Nordeste, LTDA, No. 12-50624, 2012 WL 4448886 (E.D.
19 | Mich. Sep. 25, 2012)). In support, movants present the expert opinion of Malcolm Bernard Kemp
20 | ("Kemp"), a Hong Kong solicitor and partner at the law firm of Stephenson Hardwood. See Doc. # 32-
21 | 1 at 1. According to Kemp, O' Keeffe's discovery applications: (1) improperly seek to circumvent
22 | Hong Kong procedural law and rules governing discovery from a non-party by failing to request the
23 | assistance of the Hong Kong Court; (2) are "premature" because the pleading stage has not yet closed
24 | in the Hong Kong litigation; (3) improperly seek pretrial oral testimony outside the presence of a jury,
25 | which is generally not permitted in Hong Kong civil actions; (4) improperly seek documentary
26 | evidence using a deposition subpoena; (5) fail to identify specific documents sought in violation of

27 |
28 | [2] Because movants concede that the first Intel factor applies in the instant case, the Court limits its discussion to only the second, third, and fourth Intel factors, which are in dispute.

Hong Kong procedural rules; and (6) improperly seek to conduct discovery without the oversight of a Hong Kong examiner. Id. at 13-19.

In response, O'Keeffe argues that movants mischaracterize the second Intel factor as contemplating the Hong Kong Court's receptivity to "receiv[ing]" or admitting the discovery sought when the second factor actually contemplates the Hong Kong Court's receptivity to "U.S. federal-court jurisdictional assistance." Doc. # 38 at 7 (citing Intel, 542 U.S. at 264-65). O'Keeffe next argues that the Ninth Circuit, among others, has held that § 1782 does not require the discovery sought to be discoverable or admissible in the foreign tribunal. Id. at 8 (citing, among others, Advanced Micro Devices, Inc. v. Intel Corp., 292 F.3d 664, 668 (9th Cir. 2002) aff'd, 542 U.S. 241 (2004)). O'Keeffe adds that while movants urge this Court to consider admissibility despite the absence of such a requirement under § 1782, the Second Circuit already considered and rejected that same argument in Brandi-Dohrn v. IKB Deutsche Industriebank AG, 673 F.3d 76, 83 (2d Cir. 2012).

Like movants, moreover, O'Keeffe presents the opinion of an expert from Hong Kong, Kathryn Sara Hippolyte Sanger ("Sanger"),[3] to oppose Kemp's affidavit. According to Sanger, O'Keeffe's discovery applications: (1) are proper because O'Keeffe was not required to use or exhaust Hong Kong laws and procedures before submitting her applications to this Court; (2) are not premature because they are not contingent on closure of the pleadings stage in the Hong Kong litigation; (3) are proper because there is no strict requirement for oral evidence before a Hong Kong jury; (4) comport with Order 39 of the Rules of the High Court of the Hong Kong Special Administrative Region ("Order 39), which contemplates that a party will seek both witness and documentary evidence; (5) do not violate Hong Kong law and procedure because the applications specifically identify the "relevant" documents sought; and (6) are proper even without appointment of a Hong Kong examiner because this is not a strict requirement under Order 39. See Doc. # 38-1 at 4-15.

O'Keeffe explains that Hong Kong law "expressly" allows discovery using foreign procedures, including § 1782, as evidenced not only by Order 39, but the commentary and notes from Hong Kong Civil Procedure 2015. Doc. # 38 at 9 (citing Doc. # 19-1 at 56-60; Doc. # 38-1 at 1-15; Doc. # 39-1 at 2-13). With respect to the commentary and notes, O'Keeffe points out they state that a Hong Kong

---

[3] Sanger serves as "consultant" for the Clifford Chance law firm in Hong Kong. See Doc. # 38-1 at 1.

court will "not restrain" a litigant from obtaining pre-trial discovery from a foreign country, citing to South Carolina Insurance Co. v. Assurantie Maatschappij "De Zeven Provincien" N.V. [1987] A.C. 24, a case in which the English House of Lords set aside an injunction restraining a party from utilizing § 1782. O' Keeffe argues that while Kemp suggests that South Carolina's procedural posture is different from the instant case, litigants in South Carolina sought U.S. discovery under § 1782 after the U.K. cases were commenced but before pleadings in the U.K. action were closed, just as O' Keeffe did here. O' Keeffe also points out that while Kemp suggests § 1782 should be allowed only when the evidence sought is unobtainable and/or inadmissible in the foreign jurisdiction, this suggestion is spurious, especially when one considers that while South Carolina was decided at a time when discovery against third parties was inadmissible, such non-party discovery is now permissible in Hong Kong. Indeed, O' Keeffe points out that movants concede a litigant need not exhaust procedures in the foreign tribunal to obtain discovery under § 1782, and while movants urge this Court to find that she can seek discovery only through the Hong Kong Court, O' Keeffe claims this notion is at odds with the goal of § 1782 to "provid[e] equitable and efficacious procedures for the benefit of tribunals and litigants involved in litigation with international aspects." Id. at 11-12 (citing Doc. # 19 at 7; S. Rep. No. 88-1580 (1964), reprinted in 1964 U.S.C.C.A.N. 3782, 3783). O' Keeffe then points out that movants turn to "inapt" authority because the courts in the cases movants cite denied the discovery requests either because the foreign tribunal explicitly opposed such requests, or the non-parties subject to the requests in the U.S. were not American citizens. O' Keeffe further asserts that § 1782 has previously been applied by U.S. courts to authorize discovery in matters such as the instant Hong Kong litigation, and litigants need not show they would succeed in obtaining the discovery if sought through a foreign tribunal such as this Court. Id. at 10-12 (citing, among others, In re Mak, No. C 12-80118 SI, 2012 WL 2906761 (N.D. Cal. Jul. 16, 2012); John Deere Ltd. v. Sperry Corp., 754 F.2d 132, 136 (3d Cir. 1985)).

In reply, movants restate their earlier assertions. Movants also contend this Court should disregard Sanger's declaration because Sanger represents O' Keeffe in the Hong Kong litigation, which undermines her credibility and objectivity in this case. Moreover, movants contend that O' Keeffe "hide[s] the fact" that this Court has discretion to deny the requested discovery. Doc. # 41 at

4. Movants further contend that the Court may consider foreign admissibility as one of many factors in exercising its discretion to deny O' Keeffe's applications.

As a preliminary matter, movants contend the discovery sought should have been requested by or through the Hong Kong Court. However, in recognizing that "[a] foreign nation may limit discovery within its domain for reasons peculiar to its own legal practices, culture, or traditions–reasons that do not necessarily signal objection to aid from the United States federal courts," the U.S. Supreme Court anticipated movants' concern and, nevertheless, found that the objectives of § 1782 compelled discovery even when a litigant, and not the foreign tribunal, requests such discovery. Intel, 542 U.S. at 261-62. Moreover, courts that have directly addressed this question of a "quasi-exhaustion requirement" reject the notion based on, among others, § 1782's explicit statement that "upon application of any interested person," a district court may order a person from whom discovery is sought to "give his [or her] testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal." See 28 U.S.C. § 1782 (emphasis added); Application of Malev Hungarian Airlines, 964 F.2d 97, 100 (2d Cir. 1992). Indeed, this "allowance of liberal discovery seems entirely consistent with the twin aims of Section 1782: providing efficient assistance to participants in international litigation and encouraging foreign countries by example to provide similar assistance to our courts." Advanced Micro Devices, 292 F.3d at 669. Given such, O' Keeffe was not required to request discovery through the Hong Kong Court.

Movants next raise admissibility and discoverability issues concerning O' Keeffe's discovery requests. However, the issues movants raise are contrary to law. The Ninth Circuit previously rejected any requirement that a party show, or a court consider, that the discovery sought be admissible or discoverable in foreign proceedings, holding that neither the plain language, nor legislative history and amendments of § 1782 required such. See Advanced Micro Devices, 292 F.3d at 668-69 ("We have previously rejected a requirement regarding admissibility in the foreign tribunal.... [and] [f]or good and sound policy reasons, we now reject such a requirement with respect to discoverability"); see also In re Request for Judicial Assistance from Seoul Dist. Criminal Court, Seoul, Korea, 555 F.2d 720, 723 (9th Cir. 1977) ("In our judgment our federal courts, in responding to [§ 1782] requests, should not feel obliged to involve themselves in technical questions of foreign law relating to... the admissibility

6

before such tribunals of the testimony or material sought."); see also John Deere, 754 F.2d at 136 (noting the Ninth Circuit has held that federal courts should not determine "the admissibility before... [foreign] tribunals of the evidence sought") (citing In re Request for Judicial Assistance from Seoul Dist. Criminal Court, 555 F.2d at 723 and In re Letters Rogatory from the Tokyo District, Tokyo, Japan, 539 F.2d 1216, 1219 (9th Cir. 1976)).  Indeed, the Ninth Circuit observed that if Congress wished to impose such requirements on § 1782 applicants, it could easily have done so by including statutory language to that effect.  See Advanced Micro Devices, 292 F.3d at 669.  Importantly, moreover, the U.S. Supreme Court, in Intel, affirmed the Ninth Circuit's decision in Advanced Micro Devices, concluding that § 1782 does not impose a "foreign-discoverability" requirement on applicants.  See Intel, 542 U.S. at 260-61.  Consequently, the law is clear as to these questions, and movants' attempt to raise issues already put to rest by the Ninth Circuit and U.S. Supreme Court is not well-taken.

Movants also cite cases in which courts denied § 1782 requests.  None of the cases cited are binding on this Court.  The cases are also inapplicable, as they are distinguishable from the instant case.  See e.g., Nordeste, 2012 WL 4448886 (Brazilian applicant sought to use § 1782 to obtain documents in Brazil for use in Brazil); In re Microsoft Corp., 428 F. Supp. 2d188 (S.D.N.Y. 2006) (foreign tribunal wrote a letter opposing applicant's discovery requests); In re Chevron Corp., 762 F. Supp. 2d 242, 252 (D. Mass. 2010) (district court noted that only a jurisdictional issue was before the foreign tribunal, and the court was not convinced the discovery sought under § 1782 concerned that issue).  Here, O' Keeffe is an American citizen seeking discovery from U.S.-based witnesses, and the Hong Kong Court has not expressed any opposition to O' Keeffe's discovery requests.  Furthermore, this Court finds, and movants do not dispute, the relevance of the requested discovery to the libel claim in the Hong Kong litigation.

Finally, movants submit Kemp's affidavit to show that the discovery requests raise issues under Hong Kong law and procedure, with O' Keeffe presenting Sanger's affidavit to rebut Kemp's assertions.[4]  However, the diametrically opposing views of both experts on the same issues renders

---

[4] The expert affidavits were not organized by Intel factors.  Thus, some of the expert opinions relate to both the second and third Intel factors.

impossible a determination as to whose international legal expert correctly characterizes Hong Kong law and procedure. Fortunately, the Court need not resolve these competing interpretations of Hong Kong law and procedure. See Euromepa, S.A. v. R. Emerian, Inc., 51 F.3d 1095, 1099 (2d Cir. 1995) ("The record reveals that this litigation became a battle-by-affidavit of international legal experts... [W]e do not read the statute to condone speculative forays into legal territories unfamiliar to federal judges."). This Court must simply determine whether "authoritative proof" exists that the Hong Kong Court "would reject evidence obtained with the aid of section 1782." Id. at 1099-1100 (emphasis added). Because neither Kemp's and O' Keeffe's affidavits, nor movants and O' Keeffe's assertions and supplements, constitute "authoritative proof" that the requested discovery would be unwelcome to the Hong Kong Court, there is no reason for this Court to exercise its discretion to deny O' Keeffe's discovery applications. Consequently, the Court finds that the second Intel factor does not weigh in favor of quashing O' Keeffe's subpoenas.

**b.     Third Intel Factor: Circumventing the Hong Kong Court's Proof-Gathering Restrictions or Policies**

Movants argue that O' Keeffe's applications are simply a means to circumvent the Hong Kong Court's proof-gathering procedures or policies since O' Keeffe never sought assistance from the Hong Kong Court to obtain the requested discovery. Because the basis upon which movants rely in asserting the third Intel factor has already been rejected by this Court,[5] movants' assertion under the third Intel factor necessarily fails. Thus, the Court finds that this factor does not weigh in favor of quashing O' Keeffe's subpoenas.

**c.     Fourth Intel Factor: Unduly Intrusive or Burdensome Requests**

Movants also contend that the subpoenas should be quashed because they contain unduly intrusive and burdensome requests, and amount to an "improper fishing expedition" simply designed to turn the Hong Kong litigation into a "sensationalist spectacle." Doc. # 19 at 8.

O' Keeffe, in opposition, denies that the subpoenas contain unduly intrusive or burdensome requests, pointing out that movants fail to specify which requests are intrusive, burdensome, or meritless. Further, per O' Keeffe, the subpoenas are "hardly a fishing expedition," but narrowly

---

[5] See the Court's discussion under the second Intel factor.

tailored and targeted to the issues of Adelson's use of foul or offensive language, and motive in suing O' Keeffe.  Doc. # 38 at 19.  In support, O' Keeffe points out that she asked: (1) LVSC to produce documents, interview transcripts, and audio and video recordings of Adelson using foul or offensive language; (2) Rabbi Goodman to discuss incidents in which Adelson used foul or offensive language in the rabbi's presence, the tensions between the rabbi and Adelson, and the rabbi's involvement in the Hong Kong litigation;[6] and (3) Reese and Briggs to provide testimony and documents describing Adelson's use of foul or offensive language, the damage control administered due to Adelson's use of foul or offensive language, and those communications regarding O' Keeffe, the article in suit, or the Wall Street Journal's coverage of Adelson.  Movants did not reply to O' Keeffe's assertions.

It is unclear to this Court how and why O' Keeffe's subpoenas are "obviously fishing" or unduly intrusive and burdensome, especially since movants fail to point to any sections of the subpoenas and explain how or why any of the requests are unduly intrusive, burdensome, or amount to a fishing expedition.  As such, this Court finds that the fourth <u>Intel</u> factor also does not weigh in favor of quashing O' Keeffe's subpoenas.

<u>**CONCLUSION AND ORDER**</u>

Based on the foregoing and good cause appearing therefore, **IT IS HEREBY ORDERED** that movants' motion to quash the subpoenas (doc. # 19) is **denied**.

DATED: March 24, 2015

_____
**C.W. Hoffman, Jr.**
**United States Magistrate Judge**

---

[6] According to O' Keeffe, Rabbi Goodman provided an affidavit in support of Adelson in the Hong Kong litigation.

9

# EXHIBIT  7

<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| **IN RE THE APPLICATION OF KATE O'KEEFFE FOR ASSISTANCE BEFORE A FOREIGN TRIBUNAL** | **Civil Action No. 14-5835 (WJM)** <br><br><br> <u>**OPINION**</u> |

<u>**Falk, U.S.M.J.**</u>

This is a miscellaneous action before the Court by way of a motion to quash a subpoena. [ECF No. 17.]

On September 19, 2014, Ms. Kate O'Keeffe, a Hong Kong-based reporter who is employed by Dow Jones & Company, Inc. to write for the *Wall Street Journal*, the *Wall Street Journal Asia*, and the *Wall Street Journal Europe*, filed an *ex-parte* application, pursuant to 28 U.S.C. § 1782 and Federal Rule of Civil Procedure 45, for the issuance of a subpoena to be served in New Jersey in aid of her defense of a lawsuit pending in Hong Kong. [ECF No. 1.]

The underlying Hong Kong lawsuit is a libel action filed by Mr. Sheldon G. Adelson, alleging that an article authored by O'Keeffe and published in U.S., European, and Asian editions of the *Wall Street Journal* falsely referred to him as "foul-mouthed."[1] Mr. Adelson was described by his counsel as the Chairman of the Board of Las Vegas Sands Corporation ("LVSC") and Sands China Ltd., two of the largest gaming companies in the world. The parties

---

[1] This background is drawn from the parties' submissions.

disagree how "foul-mouthed" should be defined, but in the Hong Kong proceedings, Mr.
Adelson has apparently defined "foul-mouthed" as meaning that he used language that was
"obscene, profane, or scurrilous"; "abusive, blasphemous, coarse and offensive"; and or "rude
and lewd."

On September 30, 2014, the Court granted Ms. O'Keeffe's *ex-parte* request to serve a
subpoena seeking a deposition and documents from Kirk A. Thorell, who is a partner in
PricewaterhouseCoopers' ("PwC") Florham Park, New Jersey office. [ECF No. 6.] PwC was,
for twenty-five years, until April 2013, the auditor for Mr. Adelson's United States-based
company LVSC. The *Wall Street Journal* had previously reported that "personal tension"
between Adelson and PwC played a role in PwC's decision to resign as LVSC's auditor, as did
Adelson's "challenging demeanor and demands on the auditors." It is O'Keeffe's position that
Mr. Thorell has or may have information and/or documents that would support the notion that
Mr. Adelson is "foul-mouthed."

In the Order granting the *ex-parte* request, it was made clear that the motion was being
conditionally granted, and that Mr. Thorell and/or Mr. Adelson were authorized to file a motion
to quash. [Id.] On November 11, 2014, Mr. Adelson and LVSC (collectively "Movants") filed
the present motion. [ECF No. 17.] Mr. Thorell has not filed any papers.

Full and comprehensive briefs have been submitted, together with declarations from
experts on foreign law and an authorized sur-reply. Oral argument was held on February 5,
2015. Movants' position can be summarized as objecting to the subpoena as an attempt to
circumvent Hong Kong's procedural and substantive rules, as burdensome, and as encroaching
on the confidentiality of auditor-client communications. Movants also contend the subpoena is a
"fishing expedition." Applicant's opposition contends that all of the requirements of the relevant

2

statute and Supreme Court authority are satisfied and that the information is relevant to her

defense in Hong Kong.[2]  For the reasons stated below, the motion to quash is **DENIED**.

**DISCUSSION**

**A.**      **Legal Standard**

Section 1782 is the "product of congressional efforts, over the span of nearly 150 years,

to provide federal-court assistance in gathering evidence for use in foreign tribunals."  Intel

Corp. v. Advanced Micro Devices, Inc., 542 U.S. 241, 247 (2004).  The statute provides in

relevant part:

> (a) **the district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusation**. The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court. By virtue of his appointment, the person appointed has power to administer any necessary oath and take the testimony or statement. The order may prescribe the practice and procedure, which may be in whole or part the practice and procedure of the foreign country or the international tribunal, for taking the testimony or statement or producing the document or other thing. To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure. A person may not be compelled to give his testimony or statement or to produce a document or other thing in violation of any legally applicable privilege.

28 U.S.C. § 1782(a) (emphasis added).

"Congress enacted 1782 to further the following goals: facilitating the conduct of

litigation in foreign tribunals, improving international cooperation in litigation, and putting the

---

[2] The parties' papers reveal that Ms. O'Keeffe has also sought to serve subpoenas on LVSC and other individuals out of the District of Nevada, again pursuant to Section 1782.  See Civ. A. No. 14-1518 (RBF)-(CWH) (D. Nev.).  Briefing in that matter is ongoing and closely tracks that of this case.

3

United States into the leadership position among world nations." <u>Bayer AG v. Betachem, Inc.</u>, 173 F.3d 188, 191 (3d Cir. 1999) (internal citations omitted). "However, these goals do not in turn mean that a party to foreign litigation is entitled to unbridled and unlimited discovery under the statue." <u>Id.</u> "Section 1782 vests district courts with discretion to grant, limit or deny discovery . . . . [A] district court may refuse to grant a discovery request, or may impose various conditions and protective orders attendant to the production of requested documents." <u>Id.</u>

If the statutory requirements of Section 1782 are met, the district court is not required to allow the discovery, but has the *discretion* to do so. The Supreme Court has identified four factors that are relevant to this discretionary decision:

> **[1]** Whether the documents or testimony sought are within the foreign tribunal's jurisdictional reach, and thus accessible absent § 1782 aid;

> **[2]** The nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance;

> **[3]** Whether the § 1782 request conceals an attempt to circumvent foreign proof gathering restrictions or other policies of a foreign country or the United States;

> **[4]** Whether the subpoena contains unduly intrusive or burdensome requests.

<u>Intel</u>, 542 U.S. at 264-65 (emphases added).

Finally, Congress specifically intended Section 1782 to be interpreted liberally, and the party opposing a Section 1782 application has the burden to show why the discovery is improper. <u>See</u> <u>In re Bayer AG</u>, 146 F.3d 188, 196 (3d Cir. 1988) ("Consistent with the statute's modest prima facie elements and Congress's goal of providing equitable and efficacious discovery procedures, district courts should treat relevant discovery materials sought pursuant to Section 1782 as discoverable unless the party opposing the application can demonstrate facts sufficient to justify the denial of the application.").

4

Only the discretionary *Intel* factors are discussed in the briefs.  The first *Intel* factor is not in dispute; the remaining three are.

**B.**     **Second *Intel* Factor**

The second *Intel* factor focuses on the nature of the foreign tribunal and its receptivity to judicial assistance from United States Courts.  Intel, 542 U.S. at 264. This factor is effectively broken down into two distinct parts which the case law sometimes blends together: the statutory requirement that the discovery be sought "for use" in a foreign proceeding; and the *discretionary* evaluation of whether such discovery is appropriate under the circumstances.

As a matter of statutory construction, the question is straightforward.  When assessing whether the material is being sought "for use" in a foreign proceeding, courts should not consider whether the Section 1782 application seeks information that would be discoverable or admissible in the foreign forum.  See, e.g., Brandi-Dohrn v. IKB Deutsche Industriebank AG, 673 F.3d 76, 82 (2d Cir. 2012) ("Accordingly, as a district court should not consider the discoverability of the evidence in the foreign proceeding, it should not consider the admissibility of evidence in the foreign proceeding in ruling on a Section 1782 application.").  Indeed, the Supreme Court and the Third Circuit have made clear that there is no "foreign-discoverability" statutory prerequisite to a Section 1782 application.  Intel, 542 U.S. at 259-64; John Deere v. Sperry Corp., 754 F.2d 132, 138 (3d Cir. 1985) ("a district court is not to predict the admissibility of discovered evidence in foreign tribunals").

In this District, Third Circuit Judge Greenaway (then a District Judge) articulated the relevant statutory inquiry under Section 1782: "*it is sufficient that the applicant intend to offer the evidence to a foreign court.*"  In re Imanagement Servs. Ltd., 2006 WL 547949, at *3 (D.N.J. Mar. 3, 2006) (emphasis added).  Similar language is found in the Third Circuit's John Deere

decision: "As long as the discovered information is intended for use in a foreign proceeding that comports with the notions of due process, the requirements of Section 1782 are met and an appropriate order should issue." 754 F.2d at 138. Since O'Keeffe intends to offer the evidence sought through her application in the Hong Kong proceedings, it is clear that the *statutory* requirements of Section 1782—the "for use" requirement—is satisfied.

Nevertheless, Movants contend the second *Intel* factor is not satisfied because the Court should exercise its discretion and not authorize the subpoena because of substantive and procedural questions raised under Hong Kong law. When making this discretionary evaluation, "the district court would be free, in the exercise of its discretion, to consider any materials, typically statutes or case law from the foreign jurisdiction that may be presented by the parties." In re Bayer AG, 146 F.3d at 196. If the Court is inclined to consider such information, the general view is that the second *Intel* factor weighs against discovery only where there is "authoritative proof" that the foreign court would reject the evidence. Euromepa S.A. v. R. Esmerian, Inc., 51 F.3d 1095, 1100 (2d Cir. 1995) ("We believe that a district court's inquiry into the discoverability of requested materials should consider only authoritative proof that a foreign tribunal would reject evidence in aid of Section 1782 . . . [A]bsent this type of clear directive, however, a district court's ruling should be informed by Section 1782's overarching interest in providing equitable and efficacious procedures for the benefit of tribunals and litigants involved with international aspects.").

Here, there is no "authoritative proof" submitted that the Hong Kong court would reject the evidence. The parties each submitted a declaration from an expert on Hong Kong law. Movants' expert is Malcom Bernard Kemp, a Hong Kong-based solicitor and partner in the law firm of Stephenson Harwood. O'Keeffe's expert is Kathyrn Sara Hippolyte Sanger, a Hong

Kong-based expert consultant for the Clifford Chance law firm. These declarations extensively discuss foreign law. However, they say diametrically different things about the same issues.[3]

The experts' competing opinions on Hong Kong law are summarized below. But the reality is, this discussion is for the purpose of informing a *discretionary* decision to allow Section 1782 discovery. And the mere existence of diametrically different expert testimony makes it impossible for the Court to conclude that "authoritative proof" exists that the discovery O'Keeffe seeks is inappropriate under Hong Kong law. It also becomes an exercise in analyzing complex and ambiguous aspects of foreign law and deciding what might be admissible in a Hong Kong court, something that courts have repeatedly found inappropriate.

Movants' expert, Mr. Kemp, opines as follows:

- ~~O'Keeffe's application is "premature," because the pleadings have not yet~~ closed. (Kemp Decl., ¶ 51);

- Evidence is limited to that expressly detailed in the pleadings, and since the pleadings aren't closed, those parameters aren't set yet. (Kemp Decl., ¶ 52);

- O'Keeffe's application seeks information not pleaded in the "Amended Defence" and therefore will be inadmissible. (Kemp Decl., ¶ 56);

- Order 39, which governs depositions in Hong Kong, would not allow for Mr. Thorell's deposition unless he was mentioned in the amended defense or unless it can be shown his testimony is relevant to the pleadings. (Kemp Decl., ¶ 56);

- Order 39 requires the appointment of an examiner to take a deposition in Hong Kong, and no such protection is present here. (Kemp Decl., ¶ 58);

- O'Keeffe has circumvented Hong Kong law by choosing to proceed with a Section 1782 application and not through Order 39. (Kemp Decl., ¶ 60);

---

[3] The declarations are also not broken down by *Intel* factors, and thus some of their opinions relate to both this and the third *Intel* factor (*see, infra*).

- A House of Lords opinion relied on by O'Keeffe that supports use of Section 1782 in Hong Kong—*South Carolina Ins. Co. v. Assurantie Maatschappij "De Zeven Provincien" N.V.*, [1987] 1 App. Cas. 24 (1986)—was issued at a time when third party discovery procedures were not available under Hong Kong law, but that Hong Kong law has changed, and therefore, O'Keeffe should have resorted to Hong Kong law first. (Kemp Decl., ¶ 71.)

O'Keeffe's expert, Ms. Sanger, opines as follows:

- The pleadings have closed since the application was filed, thus, the application is not premature. (Sanger Supp. Decl., ¶¶ 14-16);

- The pleadings do not need to mention Mr. Thorell, so long as he can provide relevant information to something that is in the pleadings. (Sanger Supp. Decl., ¶¶ 19-22);

- Order 39 does not require an examiner under these facts. (Sanger Supp. Decl., ¶ 30);

- Order 24 provides Hong Kong courts with wide discretion to order general discovery. (Sanger Supp. Decl., ¶ 35);

- Persuasive authority from the House of Lords (*South Carolina Insurance Co.* case) is on point. Although no longer binding after Hong Kong's return to China in 1997, it remains persuasive authority. (Sanger Supp. Decl., ¶¶ 18-20);

- There is no obligation whatsoever to pursue discovery through the Hong Kong Orders. (Sanger Decl., ¶¶ 4-6).

The above recitation establishes that there is genuine disagreement about what evidence would be admissible in the Hong Kong proceedings. This Court is not in a position to conclusively resolve competing interpretations of Hong Kong law. Nothing in any of the declarations constitutes "authorative proof" that the evidence would not be welcome in Hong Kong, and therefore, nothing in the declarations or briefs persuades the Court <u>not</u> to exercise its discretion to allow the subpoenas. Indeed, the Court is mindful of Judge Greenaway's caution

8

about wading too deeply into thorny questions of foreign law:

> In *Intel,* the Court stated that § 1782 determinations should not be
> restricted by foreign discovery rules.  Rather, the Supreme Court's
> analysis supports the proposition that United States courts should
> have the discretion to offer discovery assistance to foreign
> tribunals independent of the laws of the foreign state. The Court
> warned against interpreting § 1782 so as to require United States
> courts to analyze foreign legal rules and systems: "comparison of
> systems is slippery business."  [Movant's] position would both
> draw this Court into a difficult investigation of a foreign legal
> system and bind it with the restrictions of foreign discovery rules.

2006 WL 547949, at *3.[4]

## C.      Third *Intel* Factor

The third *Intel* factor is "whether the request is an attempt to circumvent proof-gathering

limitations."  Intel, 542 U.S. at 264.  Movants claim that this factor weighs strongly in favor of

denying the Section 1782 application.  Movants' position is essentially that there is no

explanation for why O'Keeffe declined to seek the assistance of the Hong Kong courts before

pursuing Section 1782 relief.  Indeed, much of Mr. Kemp's declaration is focused on what

discovery could be available to O'Keeffe in Hong Kong and how pursuing discovery through

Section 1782 is curious under these circumstances.  Movants contend that an inference of

circumvention should be drawn against O'Keeffe because she allegedly made no effort to obtain

discovery through Hong Kong procedures first.  The Court disagrees.

**First,** the law is clear that there is no requirement that a foreign litigant first attempt to

obtain discovery through the foreign forum before resorting to Section 1782 – that is, no foreign

"quasi-exhaustion" requirement.  See, e.g., In re Bayer AG, 146 F.3d at 195-96 ("a quasi-

---

[4] It is worth noting that Section 1782 has been applied to authorize discovery, including
depositions, for matters pending in Hong Kong courts.  See, e.g., In re Application of Esses, 101
F.3d 873 (2d Cir. 1996); In re Mack, 2012 WL 2906761, at *1 (N.D. Cal. July 16, 2012).

9

exhaustion requirement . . . has been rejected by those courts that have addressed it.").

      **Second,** there is no requirement that an applicant show that the information would be discoverable in the foreign proceeding or that it would be admissible. See, e.g., John Deere, 754 F.2d at 136 ("We do not believe that Congress intended litigants interested in foreign proceedings to resort to Section 1782 only upon an adequate showing that they could obtain letters rogatory from the foreign forum. Such a reading would virtually nullify the statutory provision that interested persons may apply for discovery orders.").

      **Third,** the cases Movants cite as examples of attempts to "circumvent" foreign forums are highly distinguishable and often involve efforts to engage in Section 1782 proceedings *after* a foreign forum has already disallowed the evidence or other suspicious circumstances arise. See, e.g., In re OOO Promnesfstroy, 2009 WL 3335608, at *8-9 (S.D.N.Y. Oct. 15, 2009) (applicant tried and failed to get same documents in foreign forum); In re IPC Do Nordeste, 2012 WL 4448886 (E.D. Mich. Sept. 25, 2012) (applicant was Brazilian but sought to use Section 1782 to gain access to documents in Brazil for use in Brazil); Advanced Micro Devices v. Intel Corp., 2004 WL 2282320 (N.D. Cal. Oct. 4, 2004) (denying petition when foreign forum submitted affidavit stating they did not want the evidence).

      Here, O'Keeffe has simply invoked procedures available to her under the law. She is a United States citizen invoking her rights under United States law. The Court draws no negative inference from her decision to resort to Section 1782. Cf. Euromepa, 51 F.3d at 1098; Weber v. Finker, 2007 WL 4285362, at *7 (S.D. Fla. Nov. 30, 2007) (rejecting notion that invoking § 1782 creates an "inference" of circumvention). This is regardless of whatever strategic maneuvering one could imagine. At bottom, the type of inference requested would really be nothing more than a *de facto* exhaustion requirement. O'Keeffe's decision to invoke United

10

States law deserves no more of an inference than Mr. Adelson's choice of forum. That is, no inference is drawn either way. Movants have not established that there is a strong basis to find circumvention of a foreign forum.

**D.    Fourth *Intel* Factor**

The final *Intel* factor is whether the application contains unduly burdensome or intrusive requests. Movants contend the application is both; it is allegedly a "fishing expedition" because O'Keeffe has no basis to believe Mr. Thorell has any information other than a prior *WSJ* report, and intrusive because it seeks confidential auditor-client communications.

The request is not burdensome. O'Keeffe claims that Thorell and PwC terminated their relationship with Mr. Adelson based on personal difficulties. While Movants refer to the discovery requests as a fishing expedition, it seems clear that the discovery sought could bear on the question of whether Mr. Adelson is "foul-mouthed" for purposes of the Hong Kong lawsuit. In other words, at least under the Federal Rules of Civil Procedure, if the information sought exists, and is within Mr. Thorell's possession, it would be relevant. See Fed. R. Civ. P. 26(b). Moreover, any burden would fall on the subpoenaed parties, who have not sought to quash the subpoenas.

The requests are also not overly intrusive. Movants contend that the information is confidential and that PwC has an obligation to treat it as such, citing to certain case law and the American Institute of Certified Public Accountants' Code of Professional Conduct. It is true that auditor-client communications are confidential. But they are not privileged. See, e.g., Couch v. United States, 409 U.S. 322, 344 (1973) ("no confidential accountant-client privilege exists under federal law"); United States v. Antolini, 271 Fed. Appx. 268, 271 n.1 (3d Cir. 2008). Confidentiality concerns can be easily dealt with through redaction and other measures short of

11

quashing the subpoena.  Moreover, as O'Keeffe notes, the types of communications sought in the

application (essentially, use of slang and offensive language) might not be covered by any

confidentiality obligations.  O'Keeffe also agrees to the redaction of anything in relevant

documents that is not responsive to the subpoena.  The Court agrees that redaction of any

information outside the scope of the subpoena is appropriate and will be required.  However, for

purposes of the fourth *Intel* factor, the discovery sought is neither burdensome nor intrusive.

## CONCLUSION

For the above reasons, Movants' motion to quash [ECF No. 17] is **DENIED**.


**s/Mark Falk**
**MARK FALK**
**United States Magistrate Judge**


**DATED:  February 10, 2015**

12

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| **IN RE THE APPLICATION OF KATE O'KEEFFE FOR ASSISTANCE BEFORE A FOREIGN TRIBUNAL** | **Civil Action No. 14-5835 (WJM)**<br><br><br>**ORDER** |

**THIS MATTER** having come before the Court by way of a motion to quash a subpoena filed by Movants Las Vegas Sands Corporation and Sheldon G. Adelson [ECF No. 17]; and the Court having considered the submissions of the parties in connection with the motion; and having heard oral argument on February 5, 2015; and for the reasons stated in the Opinion issued on this date; and for good cause shown;

    **IT IS** on this 10th day of February 2015,

    **ORDERED** that, Movants' motion is **DENIED**.

                                s/Mark Falk_____
                                **MARK FALK**
                                **United States Magistrate Judge**

# EXHIBIT  8

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **IN RE THE APPLICATION OF KATE O'KEEFFE FOR ASSISTANCE BEFORE A FOREIGN TRIBUNAL** | Civ. No. 14-5835 (WJM) <br><br> **OPINION** |

## WILLIAM J. MARTINI, U.S.D.J.

This matter comes before the Court on an appeal from Magistrate Judge Mark Falk's February 10, 2015 decision denying Sheldon Adelson's motion to quash Kate O'Keeffe's application for a subpoena under 28 U.S.C. § 1782(a). For the reasons set forth below, the appeal is **DENIED** the Judge Falk's decision is **AFFIRMED**.

## I. BACKGROUND

Appellee Kate O'Keeffe is a Hong Kong-based reporter for Dow Jones & Company, Inc. She writes for the *Wall Street Journal* and its Asian and European publications. O'Keeffe is a defendant in a libel action in Hong Kong brought by Appellant Sheldon G. Adelson ("the Hong Kong lawsuit"). The Hong Kong lawsuit arises from an article written by O'Keeffe and published in the December 7, 2012 edition of the *Wall Street Journal*. Appellee's Br. 4, ECF No. 35. In the article, O'Keeffe referred to Adelson as "foul-mouthed." *Id.* at 5.

On September 19, 2014, O'Keeffe filed an ex parte application to serve a subpoena seeking a deposition and documents from Kirk A. Thorell under 28 U.S.C. § 1782(a). Thorell is a partner with PricewaterhouseCoopers ("PwC"), which formerly provided auditing services for Adelson's Las Vegas Sands Corporation ("LVSC"). PwC resigned, allegedly because of "Adelson's 'challenging demeanor and demands on the auditors.'" *Id.* at 6. O'Keeffe sought the subpoena for use in her defense in the Hong Kong lawsuit, arguing that Thorell may have information or documents supporting the notion that Adelson is foul-mouthed. Magistrate Judge Mark Falk granted the application but provided Thorell and Adelson with the opportunity to file motions to quash. Order dated September 30, 2014, ECF No. 6. Adelson moved to quash the subpoena on November 11, 2014. *Id.* Thorell did not file a motion to quash.

On February 10, 2015, Magistrate Judge Falk issued an opinion and order regarding Adelson's motion to quash. Judge Falk's opinion centered on the discretionary factors discussed in *Intel Corp. v. Advanced Micro Devices, Inc.,* 542 U.S. 241, 264 (2004). Judge Falk found that the *Intel* factors weighed in favor of granting the Section 1782 request and denied Adelson's motion. Adelson now brings the instant appeal.

## II.  STANDARD OF REVIEW

A district court may reverse a magistrate judge's order if it finds the ruling to be clearly erroneous or contrary to law. *See* 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a); L. Civ. R. 72.1(c)(1)(A). The district court is bound by the clearly erroneous rule as to findings of fact, while the phrase "contrary to law" indicates plenary review as to matters of law. *Haines v. Liggett Group Inc.*, 975 F.2d 81, 91 (3d Cir. 1992). A finding is considered "clearly erroneous" when, "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948). A decision is considered contrary to the law if the magistrate judge has "misinterpreted or misapplied applicable law." *Doe v. Hartford Life Acc. Ins. Co.*, 237 F.R.D. 545, 548 (D.N.J. 2006).

When an appellant "seeks review of a matter within the purview of the Magistrate Judge, such as a discovery dispute, an even more deferential standard, the 'abuse of discretion' standard, must be applied." *Koninklijke Philips Electronics N.V. v. Hunt Control Sys., Inc.*, No. 11-3684, 2014 WL 5798109, at *2 (D.N.J. 2014) (quoting *Salamone v. Carter's Retail, Inc.*, No. 09-5856, 2012 WL 821494, at *4 (D.N.J. 2012)). Under this standard, the Magistrate's discovery decision is entitled to great deference and is reversed only upon an abuse of discretion. *Halsey v. Pfeiffer*, No. 09-1138, 2010 WL 3735702, at *1 (D.N.J. 2010) (citing *Kresefky v. Panasonic Commc'n and Sys. Co.*, 169 F.R.D. 54, 64 (D.N.J. 1996)).

## III.  DISCUSSION

The Court will affirm Judge Falk's decision. Section 1782 provides that "[t]he district court of the district in which a person resides or is found *may* order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal . . . ." 28 U.S.C. § 1782(a)

(emphasis added).  Thus, even where the statutory requirements are met, the district court is not required to grant a Section 1782 discovery application.   Rather, it is in the court's discretion to either approve or deny the application.  *Intel*, 542 U.S. at 264.

In *Intel*, the United States Supreme Court identified four factors for courts to consider in exercising their discretion: (1) whether the documents or testimony sought are within the foreign tribunal's jurisdictional reach, and, therefore, accessible in lieu of a Section 1782 application; (2) the nature of the foreign tribunal, the character of the proceedings, and the receptivity of the foreign government or court or agency to American federal judicial assistance; (3) whether the Section 1782 request conceals an attempt to circumvent foreign proof gathering restrictions or other policies of a foreign country or the United States, and; (4) whether the request is unduly intrusive or burdensome.  *Id.* at 264-65.  The first *Intel* factor is not in dispute in this case.

The Court finds that Judge Falk properly considered the disputed *Intel* factors and that his decision denying the motion to quash was not an abuse of discretion.  As to the second *Intel* factor, the moving party must present authoritative proof that the foreign court would reject the evidence obtained with the aid of Section 1782.  *Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1100 (2d Cir. 1995).  Examples of authoritative proof include "a forum country's judicial, executive or legislative declarations that specifically address the use of evidence gathered under foreign procedures."  *Id.*

Here, the record contains no authoritative proof that the Hong Kong court would be unreceptive to the District of New Jersey's assistance.  Rather, the record merely contains two differing interpretations of Hong Kong law from the parties' respective experts.  As Judge Falk correctly noted, district courts are discouraged from engaging in the interpretation of foreign law when conducting a Section 1782 analysis.  *See In re Application of Imanagement Servs. Ltd.*, No. 05-2311, 2006 WL 547949, at *2 (D.N.J. Mar. 3, 2006) ("The [Supreme] Court [in Intel] warned against interpreting § 1782 so as to require the United States courts to analyze foreign legal rules and systems . . . ."); *Euromepa*, 51 F.3d at 1099 ("[I]t is unwise . . . for district judges to try to glean the accepted practices and attitudes of other nation from are likely to be conflicting . . . and biased interpretations of foreign law.").  Further, the Hague Evidence Convention is in effect between the United States and Hong Kong, which indicates that Hong Kong's courts are receptive to American judicial assistance.  *See In re Application of Imanagement Servs. Ltd.*, 2006 WL 547949, at *4; *In re Servicio Pan Americano de Proteccion*, 354 F. Supp. 2d 269, 274 (S.D.N.Y. 2004).

3

Moving to the third *Intel* factor, the record lacks any indication that O'Keeffe is attempting to evade restrictions on discovery in Hong Kong. Adelson argues that Judge Falk should have inferred circumvention based on O'Keeffe's decision to pursue discovery through Section 1782 rather than letters rogatory. However, courts have repeatedly found that Section 1782 applicants are not required to apply for letters rogatory through the forum nation before making a Section 1782 application. *See, e.g.*, *In re Bayer AG*, 146 F.3d 188, 196 (3d Cir. 1998) (citing *In re Malev Hungarian Airlines*, 964 F.2d 97, 100 (2d Cir. 1992). Adelson's argument that Judge Falk was required to at least consider O'Keeffe's decision not to seek a letter rogatory in Hong Kong is likewise unavailing. Though a court *may* consider such evidence in making its discretionary finding, there is no requirement that a court *must* do so. *See In re Application of Caratube Int'l Oil Co.*, 730 F. Supp. 2d 101, 107 (D.D.C. 2010) (quoting *In re Application of Babcock Borsig AG*, 583 F. Supp. 2d 233, 241 (D. Mass. 2008) ("[T]he district court may, in its discretion, properly consider a party's failure first to attempt discovery measures in the foreign jurisdiction.").

Finally, as to the fourth *Intel* factor, nothing in the record indicates that O'Keeffe's request was either unduly burdensome or unduly intrusive. As an initial matter, courts have repeatedly held that movants do not have standing to challenge discovery as unduly burdensome where the burden falls on a third party. *See, e.g.*, *PKFinans Int'l Corp. v. IBJ Schroder Leading Corp.*, No. 93-5375, 1996 WL 525862, at *4 (S.D.N.Y. 2003) ("IBJ does not have standing to contest the subpoena on the grounds that it . . . imposes an undue burden since it is not IBJ's employees that would be burdened by the production but the [third party's] employees."). Here, any burden imposed by O'Keeffe's requested subpoena falls squarely on Thorell and/or PwC.

Additionally, Adelson's confidentiality concerns do not render the Section 1782 request unduly intrusive. *See In re Ex Parte Apple Inc.*, No. 12-80013, 2012 WL 1570043, at *3 (N.D. Cal. 2012) (finding that confidentiality concerns do not pertain to the intrusiveness of the requested subpoena where no legal privilege is invoked). Courts have repeatedly found that there is no accountant-client privilege under federal law. *See, e.g.*, *Couch v. United States*, 409 U.S. 322, 335 (1973). And as Judge Falk correctly noted, any concerns about the potential disclosure of confidential information can be alleviated through protective orders. Thus, Judge Falk did not abuse his discretion in denying Adelson's motion to quash the Section 1782 subpoena.

## IV.   CONCLUSION

For the above reasons, the appeal is **DENIED** and Judge Falk's decision is **AFFIRMED**.  An appropriate order follows.

/s/ William J. Martini
**WILLIAM J. MARTINI, U.S.D.J.**

**Date: August 26, 2015**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

**IN RE THE APPLICATION OF KATE
O'KEEFFE FOR ASSISTANCE
BEFORE A FOREIGN TRIBUNAL**

Civ. No. 14-5835 (WJM)

## <u>ORDER</u>

**THIS MATTER** comes before the Court on Sheldon Adelson's appeal of

Magistrate Judge Falk's February 10, 2015 decision denying Adelson's motion to

quash Kate O'Keeffe's application for a subpoena under 28 U.S.C. § 1782(a). For

the reasons set forth in the accompanying opinion; and for good cause appearing;

**IT IS** on this 26th day of August 2015, hereby,

**ORDERED** that Adelson's appeal is **DENIED**; and it is further

**ORDERED** that Judge Falk's February 10, 2015 decision is **AFFIRMED**.


_____/s/ William J. Martini_____
**WILLIAM J. MARTINI, U.S.D.J.**

1